# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 5, 2007        Decided February 15, 2008

No. 04-3086

UNITED STATES OF AMERICA,
APPELLEE

v.

DELJUAN BRANHAM,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00285-01)

*A. J. Kramer*, Federal Public Defender, argued the cause and filed the briefs for appellant. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Mary Chris Dobbie*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese*, *III* and *Elizabeth Trosman*, Assistant U.S. Attorneys.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: A jury found Deljuan Branham guilty of possession with intent to distribute 100 grams or more of a mixture or substance containing phencyclidine (PCP), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iv). Branham contends that his conviction should be reversed because the government's evidence was insufficient to support it and because the district court improperly admitted expert testimony against him. For the reasons set forth below, we reject those arguments and affirm the conviction.

Branham further contends that, if we do not reverse his conviction, we should remand for resentencing in light of the changes to Guidelines sentencing wrought by *United States v. Booker*, 543 U.S. 220 (2005). The government agrees that a remand is required but suggests that we order only a limited remand, pursuant to *United States v. Coles*, 403 F.3d 764 (D.C. Cir. 2005), to determine whether the district court "would have imposed a different sentence materially more favorable to the defendant had it been fully aware of the post-*Booker* sentencing regime." *Id.* at 770. Although we ordinarily would order a *Coles* remand, in this case the district judge who sentenced Branham has retired and hence is no longer available to answer the *Coles* question. A remand for resentencing in light of *Booker* is therefore the appropriate disposition.

I

The evidence that the government presented at trial was as follows. United States Postal Inspector Joseph Okronley testified that, on June 5, 2003, he examined a suspicious express mail package at the Baltimore-Washington International Airport mail facility. He regarded the package as suspicious because the handwritten label stated that the sender was a "Jhonson" who

lived on "West Jhonson Street" in Compton, California. Okronley brought the package to the attention of Inspector Sherwin Green, who contacted the Compton post office and discovered that the address did not exist. Green then contacted the letter carrier for the addressee -- a "Babbra Rice" at Apartment 52, 2325 15th Street, N.W., Washington, D.C. The carrier advised Green that the building at that address had three- rather than two-digit apartment numbers, that he did not recognize the addressee's name, and that "there was drug distribution going on" in apartment 301 of the building. Trial Tr. 66-67, 129 (Mar. 10, 2004).

Inspector Okronley arranged to have a drug dog sniff the package, and the dog alerted. After obtaining a search warrant, the inspectors opened the package and found a can containing 32 ounces of liquid PCP sealed inside a vacuum-wrapped plastic bag. A drug expert testified that the wholesale price of a 32-ounce bottle on the West Coast was $7,000 to $8,000, and that the street value of that amount of PCP was roughly $38,000. A DEA chemist determined that one ounce of the liquid in the bottle contained 26.6 grams of PCP.

Green testified that, on June 6, 2003, he and officers of the Metropolitan Police Department (MPD) set up a controlled delivery of the package. Wearing a mail carrier's uniform and driving a mail truck, Green parked in front of the building on 15th Street and pretended to be busy with work inside the truck. A few minutes later, defendant Deljuan Branham called to Green from the doorway of the building and asked if he was coming inside. Green approached and responded that he had a package for apartment 52, but that there was no such apartment in the building. Branham then asked if the package was for Barbara Wrice. Branham said that Wrice was his aunt, that she lived in apartment 512, and that she had "been calling the post office all day trying to get this package." Trial Tr. 86 (Mar. 10,

2004). Green testified that he knew Wrice had not been calling the post office because he had asked the post office to contact him on his cell phone if anyone inquired about the package, and there had been no call.

Green further testified that Branham appeared "anxious to get the package." *Id*. at 87. He repeatedly asked Green if he could take the package and told Green that Wrice had sent him down to the lobby to get it for her. Green told Branham that he had to deliver the package to apartment 512 and that he would need to see Branham's identification. Branham told Green that he had a key to the apartment and suggested that they go upstairs together; Green agreed and went to the truck to get the package. While Green was gone, Sergeant Darrell Johnson of the MPD, dressed in plain clothes, approached the building. He pretended that he was there to visit a female resident, and Branham let him into the lobby.

When Green returned from the truck with the package, he changed the plan and asked Branham to bring his identification and the apartment key down to the lobby instead. Branham agreed, and a few minutes later came back to the lobby and showed Green the key and his ID. Green handed him a postal delivery form to fill out. According to Green, Branham appeared nervous as he filled out the form. He wrote down an incorrect street address and signed a name -- "Wessaria Branham" -- that did not match his identification, although Wrice later testified that she called him "Wes."

After Branham completed the paperwork, Green handed him the package and gave Sergeant Johnson a signal to take Branham into custody. Johnson then approached, identified himself as a police officer, and told Branham that he was under arrest. Branham resisted, but he was ultimately restrained and apprehended.

After the arrest, other MPD officers conducted a search of Wrice's apartment with her consent. MPD Detective James Zerega testified that Wrice was in the bedroom and appeared to be bedridden. Two men were also in the apartment. One came out of the bathroom as the police entered; the other was in the living room. One of the men had $2,386 in cash on him. The officers found two vials of PCP in the freezer, two ziploc bags of marijuana on the grass beneath the open bathroom window, and a supply of empty ziploc bags on the kitchen table matching those containing the marijuana. Zerega testified that marijuana and PCP were often used "in tandem," Trial Tr. 126 (Mar. 12, 2004), although the government's drug expert testified that he had not seen "a whole lot of PCP on marijuana" in recent years, Trial Tr. 113 (Mar. 11, 2004 (PM)).

At trial, Wrice testified that she suffered from numerous disabling afflictions. She said that the PCP in the freezer was not hers, that she had never ordered PCP, and that she did not know it was in the apartment. She said that she had known Branham for about ten years, that she thought he lived in apartment 301 of her building, that he was like a friend or nephew to her, that he often came over to keep her company or help with errands, that he picked up her mail for her on occasion, and that he and the other two men were friends who would sit in her front room and talk for hours. She testified that she was not expecting a package on June 6, 2003, and did not know anyone in California. On direct examination, Wrice testified that she did not know if Branham had asked if he could get her mail that day or if she had asked him to do so. On cross-examination, she testified that she had asked him.

On redirect examination, however, the government established that Wrice told the grand jury that Branham had asked to go to the mailbox for her because he was expecting a package, and that he had previously received two or three

packages at her address. Detective Zerega also testified that he had taken Wrice's statement immediately after Branham's arrest, and that she told him that, an hour before the arrest, Branham had asked her for her mail key because he "'was waiting for a package to come to [her] address.'" Trial Tr. 54 (Mar. 12, 2004). She further told Zerega that Branham lived in apartment 301. Both the statement to Zerega and the grand jury testimony were entered into evidence.

Branham did not testify. His defense consisted of the testimony of three witnesses. The building's resident manager testified that Branham did not actually live in the building but that he visited often. He further testified that he had never seen anyone sell drugs in or around the building. The defense also called a witness who testified that he was in the lobby at the time of Branham's arrest, and that he never saw the postal carrier give Branham the package. Finally, Branham called Paul Wetzel, who had moved into apartment 301 in October 2003, after the events in question. Wetzel was called to rebut testimony by an MPD officer that Wetzel had told him people knocked on his door late at night, asking for "Deljuan" and "Wesley." Wetzel testified that he was unable to recall what names the people who knocked on his door had mentioned, and merely told the officers that Deljuan and Wesley "sounded familiar" when the officers mentioned those names. Trial Tr. 58-59 (Mar. 15, 2004 (AM)).

On March 16, 2004, after a four-day trial, the jury found Branham guilty of possession with intent to distribute 100 grams or more of a mixture or substance containing PCP, an offense that carries a statutory mandatory minimum sentence of 5 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(iv); Presentence Investigation Report (PSR) ¶ 59. The sentencing range under the United States Sentencing Guidelines was 121-151 months. PSR ¶ 60. On June 24, 2004, the district court sentenced

Branham to 132 months. Since the date of sentencing, Branham's sentencing judge has retired from the bench. Branham now appeals both his conviction and his sentence.

II

Branham appeals his conviction on two grounds. His first contention, which need not detain us long, is that the district court erred in permitting Inspector Green to testify about how and why drug dealers use express mail to send narcotics. Branham contends that the testimony constituted expert opinion, and that Green was not qualified as an expert. While disagreeing that only an expert could testify as to these points, the government also argues that any error in admitting that portion of Green's testimony was harmless, *see* FED. R. CRIM. P. 52(a), because it did not inculpate Branham. The government's point is well taken. Branham did not dispute that the package was sent by a drug dealer or that it contained PCP. His defense was that he never took possession of the package and that he did not know what it contained -- topics not covered in the disputed testimony. Not surprisingly, Branham did not respond to the government's harmless error argument in his reply brief. Because we agree with that argument, we reject Branham's claim that the admission of Green's testimony compels reversal of his conviction.

The defendant's principal contention is that the government's evidence was insufficient to support his conviction. Our standard for reviewing such a challenge is narrow: We must accept the jury's guilty verdict if we conclude that "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making that determination, "the prosecution's evidence is to be viewed in the

light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (internal quotation marks and citation omitted). Branham argues that the government's evidence was insufficient because "there was no indication defendant had any idea what was in the package." Appellant's Br. 28. We disagree.

First, there was evidence from which the jury could infer that the package, containing thousands of dollars worth of drugs, was sent to a mailbox to which Branham had arranged his own ready access. Wrice testified that Branham had picked up her mail for her on prior occasions, and she confirmed that she told the grand jury that he had previously received two or three packages of his own at her address. When Branham asked for her mailbox key on the day of the delivery, she gave it to him without hesitation.

Second, there was evidence from which the jury could conclude that Branham was anticipating the arrival of the package. Inspector Green testified that Branham called to him when he was at the postal truck, asked him whether he was coming into the building, appeared anxious to get the package, and repeatedly asked Green if he could take the package from him. *See United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995) (finding that the defendant's "general keen interest in the arrival of the package" was "circumstantial evidence supporting an inference that [the defendant] had knowledge of the package's true contents"); *United States v. Simms*, 18 F.3d 588, 594 (8th Cir. 1994) (holding that evidence that the defendant "was expecting the package" was support for "the inference of his knowing involvement"). Moreover, although Branham told Green that it was Wrice who was anticipating the arrival of the

package, Wrice testified that she was not. In fact, she told both Detective Zerega and the grand jury that Branham had said *he* was expecting a package and had asked for her key so he could retrieve it.[1]

Third, there were numerous pieces of evidence suggesting that Branham was trying to conceal his connection to the package, from which the jury could conclude that he had knowledge of its illegal contents. *See Jackson*, 55 F.3d at 1226 (holding that the defendant's "attempts to disassociate his name from the delivery of the package showed consciousness of guilt"); *Simms*, 18 F.3d at 594 (holding that the "fact that [the defendant] signed a false name" on a delivery sheet "supports the inference that he wanted to conceal his true identity, which, in turn, supports the inference that his involvement in the transaction was knowing and intentional"). In this regard, there was Branham's just-mentioned statement to Green that it was Wrice who was expecting the package, contradicted by Wrice's testimony; there was also Branham's statement that Wrice had been calling the post office for the package, contradicted by Green's information that no one had done so. In addition, there was the fact that Branham wrote a name and address on the delivery receipt that differed from those on his identification card. Although a jury could have concluded from Wrice's testimony (that she called him "Wes") that "Wessaria Branham" was Branham's true name, it did not have to do so. Green's testimony that Branham appeared nervous while filling out the delivery receipt was further evidence from which the jury could infer his guilty knowledge. *See United States v. Johnson*, 57 F.3d 968, 972 (10th Cir. 1995) (holding that, inter alia, the

---

[1]Although Wrice's trial testimony was inconsistent with some parts of her grand jury testimony, those parts were admissible as substantive evidence, *see* FED. R. EVID. 801(d)(1), and a reasonable juror could have credited the grand jury testimony.

defendant's "nervousness . . . directed at the package in question," and the fact that she used a false first name and address on an airbill, supported the "jury's reasonable inference of [her] knowledge" of the package's contents).

Finally, there was evidence that would support an inference that Branham was involved in drug dealing out of Wrice's building. Wrice testified that Branham spent hours with his friends in her apartment, where the police found PCP that Wrice testified was not hers. Further, the police found more than $2,000 in the pocket of one of those friends. From this, a reasonable jury could conclude that Branham and his friends took advantage of a bedridden woman and used her apartment to store illegal drugs. Such a conclusion was also supported by Green's testimony that the regular mail carrier had reported that drug distribution was going on in apartment 301 of the building[2] -- the apartment in which Wrice thought Branham lived. *See Simms*, 18 F.3d at 594-95 (affirming a conviction for receipt of a package of crack cocaine where the defendant had been involved in other drug activity and signed a false name). All of this, together with the evidence recited in the preceding paragraphs, was more than sufficient to permit a rational trier of fact to find beyond a reasonable doubt that Branham knew the package contained a controlled substance.

Branham next argues that, even if the jury could have reasonably concluded that he knew the package contained a controlled substance, it could not have found that he specifically

---

[2]Branham did not object to this testimony on hearsay (or any other) grounds at trial, and does not argue on appeal that it constitutes plain (or any other kind of) error. *See United States v. White*, 116 F.3d 903, 923 (D.C. Cir. 1997) (noting that hearsay evidence not objected to at trial may be considered by the jury and appellate court in the absence of plain error).

knew the substance was PCP. Such a finding, he insists, is required for conviction. Because we do not agree that such a finding is required, we need not consider whether it could reasonably have been made.

Branham's contention is that a conviction for violating 21 U.S.C. § 841(a) and (b)(1)(B)(iv) requires proof that the defendant knew the drug he possessed was PCP. He bases this claim on *Apprendi v. New Jersey*, which held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). After *Apprendi*, Branham maintains, a defendant's knowledge of drug type is an element of the offense that the government must prove beyond a reasonable doubt. Appellant's Reply Br. 7. In making this claim, Branham faces an uphill climb, given that our eleven sister circuits have all held, after *Apprendi*, that a defendant's knowledge of drug type is not an element of the offenses proscribed by § 841(a) and (b).[3] Our own examination persuades us that the hill is

---

[3]*See United States v. Collazo-Aponte*, 281 F.3d 320, 326 (1st Cir. 2002); *United States v. King*, 345 F.3d 149, 152-53 (2d Cir. 2003); *United States v. Barbosa*, 271 F.3d 438, 458 (3d Cir. 2001); *United States v. Brower*, 336 F.3d 274, 276-77 (4th Cir. 2003); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 699-700 (5th Cir. 2003); *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003); *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001); *United States v. Sheppard*, 219 F.3d 766, 768 n.2, 769 (8th Cir. 2000); *United States v. Carranza*, 289 F.3d 634, 644 (9th Cir. 2002); *United States v. Briseno*, 163 F. App'x 658, 666 (10th Cir. 2006); *United States v. Garcia-Frias*, 239 F. App'x 575, 577 (11th Cir. 2007). There is, however, some intra-circuit inconsistency on this point. In *United States v. Jenkins*, 345 F.3d 928, 942 (6th Cir. 2003), the Sixth Circuit listed a defendant's knowledge that a package contained cocaine as an element of the offense, although it had recently rejected a requirement

insurmountable.

Branham is correct that, "[a]fter *Apprendi*, . . . this court interpreted § 841 as a tripartite statute establishing three separate offenses, with different maximum sentences based on [the] drug quantity" thresholds for specific drug types listed in that section. *United States v. Graham*, 317 F.3d 262, 274 (D.C. Cir. 2003); *see United States v. Webb*, 255 F.3d 890, 895-96 (citing *United States v. Fields*, 242 F.3d 393, 396 (D.C. Cir. 2001), *aff'd and amended on reh'g*, 251 F.3d 1041, 1043 (D.C. Cir. 2001)). Therefore, "'before a defendant can be sentenced to any of the progressively higher statutory maximums that are based on progressively higher quantities of drugs specified in subsections 841(b)(1)(A) or (B), the Government must state the drug type and quantity in the indictment, submit the required evidence to the jury, and prove the relevant drug quantity beyond a reasonable doubt.'" *United States v. Lafayette*, 337 F.3d 1043, 1048 (D.C. Cir. 2003) (quoting *Fields*, 242 F.3d at 396). In accordance with these requirements, Branham's indictment listed a mixture or substance containing PCP as the drug type and 100 grams or more of that mixture or substance as the quantity. It was the jury's determination that Branham's crime involved that drug type and quantity that subjected him to the mandatory minimum sentence of 5 years' and maximum sentence of 40 years' imprisonment specified in 21 U.S.C. §

---

to prove knowledge of drug type and quantity in *Villarce*, 323 F.3d at 439 (citing *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)). Similarly, the Eighth Circuit stated in *Simms* that "the government must prove beyond a reasonable doubt that the [the defendant] 'knowingly possessed cocaine with intent to distribute it,'" 18 F.3d at 594 (quoting *United States v. Bennett*, 956 F.2d 1476, 1482 (8th Cir. 1992)), but it subsequently explained in *Sheppard* that knowledge of drug type and quantity is *not* required, *see* 219 F.3d at 768 n.2, 769.

841(b)(1)(B)(iv).[4]

But nothing in § 841 or our case law suggests that *knowledge* of the specific drug type (or quantity) at issue is an element of any of the offenses it states. To the contrary, § 841(a) requires only that the defendant "knowingly or intentionally . . . possess with intent to . . . distribute . . . *a controlled substance*." 21 U.S.C. § 841(a) (emphasis added). And § 841(b), which assesses increasing penalties for different combinations of drug types and quantities, requires proof only that the offense "involv[ed]" the specified type and quantity. 21 U.S.C. § 841(b). In short, the defendant's knowledge of the type of drug at issue in his offense is not a "fact that increases the penalty for a crime beyond the prescribed statutory maximum," and hence is not a fact that "must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Accordingly, there is no ground for concluding that the evidence was insufficient to support the charge upon which Branham was convicted.

## III

Branham also appeals from the sentence imposed by the district court. At the time of his sentencing in 2004, courts

---

[4]Had Branham been charged and found guilty of possession with intent to distribute a kilogram or more of a mixture or substance containing PCP, he would have faced a mandatory minimum sentence of 10 years and a maximum sentence of life. *See* 21 U.S.C. § 841(b)(1)(A)(iv). Had the crime involved less than 100 grams of such a mixture or substance, or had the indictment charged no specific quantity, Branham would have faced a maximum sentence of 20 years, with no mandatory minimum. *See* 21 U.S.C. 841(b)(1)(C). *See generally Lafayette*, 337 F.3d at 1048; *Webb*, 255 F.3d at 897.

regarded the U.S. Sentencing Guidelines as mandatory. In *United States v. Booker*, however, the Supreme Court held that the enhancement of a defendant's sentence pursuant to a mandatory guidelines regime violates the Sixth Amendment. 543 U.S. 220, 244 (2005); *see United States v. Adewani*, 467 F.3d 1340, 1341 (D.C. Cir. 2006); *United States v. Mejia*, 448 F.3d 436, 452 (D.C. Cir. 2006). To remedy this constitutional defect, the Court severed the provisions of the Sentencing Reform Act that made the Sentencing Guidelines mandatory, thereby rendering them "effectively advisory." *Booker*, 543 U.S. at 245; *see Adewani*, 467 F.3d at 1341.

In light of *Booker*, both parties agree that the district court erred in imposing a mandatory Guidelines sentence. In a case in which the defendant objected to the mandatory application of the Guidelines in the district court, and where we cannot find the error harmless, we must vacate the sentence and remand for resentencing. *See United States v. Ayers*, 428 F.3d 312, 312 (D.C. Cir. 2005); *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005). However, where -- as here -- the defendant did not object in the district court, we review a *Booker* claim only for plain error. *See United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005). In *Coles*, we held that the dispositive question in such a case is "whether there would have been a materially different result, more favorable to the defendant, had the sentence been imposed with the post-*Booker* sentencing regime." *Id.*

We further held in *Coles* that, where the sentencing record is insufficient for us to determine what sentence the district court would have imposed had it known it should have regarded the Guidelines as merely advisory, the appropriate disposition is not to vacate and remand for a full resentencing, but rather to grant a limited remand directed to a single question: "while retaining jurisdiction over the case, we [will] remand the record

to the District Court . . . to determine whether it would have imposed a different sentence, materially more favorable to the defendant, had it been fully aware of the post-*Booker* sentencing regime." *Id.* at 771; *see Mejia*, 448 F.3d at 454.[5]  Our rationale was as follows:  "'[t]he only practical way (and it happens also to be the shortest, the easiest, the quickest, and the surest way) to determine whether the kind of plain error argued in these cases has actually occurred is to ask the district judge.'"  *Coles*, 403 F.3d at 770 (alteration in original) (quoting *United States v. Paladino*, 401 F.3d 471, 482 (7th Cir. 2005)).  In adopting this limited remand procedure, we followed the lead of the Seventh and Second Circuits.  *See Paladino*, 401 F.3d at 484; *United States v. Crosby*, 397 F.3d 103, 117-18 (2d Cir. 2005).

Both the government and the defendant agree that there is nothing in the record that indicates how the district court would have sentenced Branham had the court known that the Sentencing Guidelines were only advisory, and both therefore agree that a remand is required.  Branham also acknowledges that his case "would ordinarily be subject to [a limited, *Coles*] remand."  Appellant's Br. 32.  However, because the judge who sentenced him has since retired, Branham argues that we should instead vacate the sentence and remand for a complete resentencing.  The government, by contrast, maintains that a *Coles* remand is still appropriate, albeit with a new sentencing judge.   But the government concedes that, under these circumstances, we should modify the *Coles* procedure -- which ordinarily contemplates that the district court will hear only from the defendant's counsel, *see Coles*, 403 F.3d at 770 -- to permit the defendant to appear at the remand hearing as well.

---

[5]If thereafter the district court notifies this court that it would have imposed a materially more favorable sentence, we will then vacate the sentence and remand for a full resentencing. *See Coles*, 403 F.3d at 770-71.

This is the first time that we have faced the question of how to treat an unobjected-to *Booker* error when the original sentencing judge is no longer available to preside over a remand. The Seventh and Second Circuits, which we followed in *Coles*, have divided over that question. The Seventh Circuit has reasoned that, because "the only person who could really tell us whether he would have imposed the same sentence based on the facts and evidence of a particular case is the original 'sentencing judge,'" there is "no purpose in restricting a newly assigned judge to comparing the sentence he would impose post-*Booker* . . . to the sentence initially imposed." *United States v. Bonner*, 440 F.3d 414, 416, 417 (7th Cir. 2006). Thus, in the "unusual and rare circumstance[]" of a sentencing judge's unavailability, the Seventh Circuit vacates the sentence and remands for full resentencing. *Id.* at 417; *see also United States v. Sanders*, 421 F.3d 1044, 1052 (9th Cir. 2005) (holding that, when the original sentencing judge is unavailable, "the purposes underlying [the limited remand] are frustrated," and "the appropriate response to *Booker* error is to vacate the original sentence and remand for a full resentencing hearing").

The Second Circuit, by contrast, has reasoned that the "direct sentencing experience" of all district judges "necessarily means" that a judge on reassignment can determine "whether there is a nontrivial difference between a challenged original sentence and one that would have been imposed with a correct understanding of the law." *United States v. Garcia*, 413 F.3d 201, 228 (2d Cir. 2005). That circuit has therefore employed a modified limited remand, in which the defendant has the right to appear at the remand hearing, and the reassigned judge "consider[s] what sentence *he* or *she* would have imposed on behalf of the court with the benefit of *Booker* and a full record." *Id.* The reassigned judge need not, however, attempt the "impossible" task of determining "what sentence the original judge would have imposed." *Id.*

Although the Second Circuit's approach is not unreasonable, we come down on the side of the Seventh. The question we asked in *Coles* was whether the original sentencing judge would have imposed a materially more favorable sentence had he known that he had sentencing discretion. Because district courts -- no matter how collegial they may be -- do not have a collective consciousness, one judge's conclusion as to what another would have done in a circumstance the latter never contemplated would truly be a legal fiction. (The Second Circuit does not disagree, conceding that determining what the first judge would actually have done would be "impossible.") Nor, under these circumstances, is a limited remand a "practical way" -- or a "short," "easy," "quick," or "sure" way -- to resolve our problem. *Coles*, 403 F.3d at 770. We cannot simply "ask the district judge" who imposed the sentence to consider the issue in light of a record he or she knows quite well. *Id.* Instead, a newly assigned judge would have to examine the entire record afresh, and hear from both counsel and the defendant.

Because the rationale for a limited remand in a case like this is weak and the practical advantages are slight, we are reluctant to accept the government's suggestion to institutionalize yet a third kind of remand -- effectively *Coles*-plus (or full resentencing-minus). We are particularly reluctant to do so since there are so few cases as to which it is likely to apply. *Booker* does not apply retroactively to cases on collateral review, *see In re Fashina*, 486 F.3d 1300, 1303 (D.C. Cir. 2007), and, as the government concedes, there are few pre-*Booker* cases left in the direct review pipeline. Indeed, this one arises only because Branham's appeal was substantially delayed by difficulties in obtaining and transcribing the trial record. Under these circumstances, adding more layers of complexity to our remand procedures seems not worth the candle.

18

Accordingly, we hold that, where a defendant did not raise a *Booker*-like objection at his original sentencing, and the record does not reveal whether the now-unavailable sentencing judge would have imposed a materially different sentence under a post-*Booker* regime, the appropriate disposition is to vacate the sentence and remand the case for resentencing. As that is the situation here, that is our disposition.

IV

Defendant Branham's conviction is affirmed, and the case is remanded for resentencing consistent with *United States v. Booker*.

*So ordered.*