# United States Court of Appeals
## For the First Circuit

No. 09-1504

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT A. URCIUOLI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Circuit Judge,

Souter,[*] Associate Justice,

and Howard, Circuit Judge.

Martin G. Weinberg with whom Kimberly Homan was on brief for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Luis M. Matos, Assistant United States Attorney, Dulce Donovan, Assistant United States Attorney, and Peter F. Neronha, United States Attorney, were on brief for appellee.

July 20, 2010

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  Robert Urciuoli, the former chief executive officer of Roger Williams Medical Center ("RWMC") in Providence, Rhode Island, seeks review of his conviction following his second trial for multiple counts of honest services mail fraud and conspiracy to commit such fraud.[1]  He was convicted of the same offense in an earlier trial, but that conviction was vacated on appeal.  <u>United States</u> v. <u>Urciuoli</u> ("<u>Urciuoli I</u>"), 513 F.3d 290, 300 (1st Cir. 2008).  <u>Urciuoli I</u> describes some background facts of this case, as well as the governing statute and case law.

The gravamen of the charge against Urciuoli was his role in a scheme to bribe--in the guise of an employment contract--John Celona, then a Rhode Island state senator.  Insofar as Urciuoli challenges the sufficiency of the evidence, the facts are to be taken in the light most favorable to the jury's verdict.  <u>United States</u> v. <u>Arroyo</u>, 546 F.3d 54, 55-56 (1st Cir. 2008).  The pertinent events and proceedings are as follows.

In the summer of 1997, Celona--after discussion with Urciuoli (CEO of RWMC) and Frances Driscoll (Senior Vice President of RWMC)--spoke and voted against overriding the Rhode Island

---

[1]The mail fraud statute, 18 U.S.C. § 1341 (2006), makes it a federal offense to use the mails in connection with a scheme to defraud and, after the Supreme Court declined to apply the statute in political corruption cases where no loss of money or property was proved, Congress amended the statute to include a scheme "to deprive another of the intangible right of honest services," <u>id.</u> § 1346.  <u>See</u> <u>United States</u> v. <u>Sawyer</u> ("<u>Sawyer I</u>"), 85 F.3d 713, 723-24 (1st Cir. 1996).

governor's veto of a bill that (if passed) would make it hard for a for-profit entity to acquire a non-profit hospital. Urciuoli and Driscoll opposed the bill (and supported its veto) because it would prevent their desired sale of RWMC to another entity. Celona failed by two votes to sustain the veto, so the bill became law.

Immediately after this effort, Celona asked Urciuoli for employment, explaining that he was going through financial difficulties. In February 1998, Celona signed a contract purportedly employing him to market an RWMC-owned nursing home called Elmhurst Extended Care and an assisted living facility--the Village at Elmhurst ("the Village")--owned partly by an RWMC subsidiary and partly by a separate entity owned by a man named Peter Sangermano.

Although Celona did some marketing for the Village, his efforts were fairly modest and his compensation substantial. In the case that followed, the government charged that Urciuoli was in substance employing Celona to use his office on behalf of RWMC in two different respects:

> •to support or oppose bills in accordance with RWMC's interest, including attempts to "kill" certain bills, and otherwise to promote RWMC's interests with respect to pending legislative matters;

> •to conduct meetings at Celona's government office with Urciuoli and representatives of two major insurance companies in order to resolve longstanding disputes about reimbursements owed to RWMC.

Urciuoli, Driscoll, Sangermano and RWMC were indicted in the Rhode Island federal district court, and RWMC entered into a plea bargain but the three individual defendants went to trial. Although Sangermano was acquitted, Urciuoli and Driscoll were convicted on various counts of honest services mail fraud or aiding or abetting such fraud, 18 U.S.C. §§ 2, 1341, 1346, and--in Urciuoli's case--also conspiracy to commit honest services mail fraud, id. § 371.

Urciuoli and Driscoll appealed and we held that certain of the conduct presented to the jury in the first trial--namely, Urciuoli and Driscoll's role in Celona's lobbying of municipal officials to increase the number of patients brought to Roger Williams Hospital by ambulance--was not a crime under the honest services statute. Urciuoli I, 513 F.3d at 295-96. Because the jury instructions permitted conviction for such conduct and the jury might have convicted on that basis, a new trial was ordered. Id. at 297.

In the new trial, the government presented much of the evidence offered in the first trial, but Celona did not testify and this time the government limited its theory to quid pro quo bribery, eschewing any suggestion that--absent bribery--an undisclosed conflict of interest on Celona's part was sufficient, and avoiding reliance on Celona's lobbying relating to the ambulance service. The theory thus fits within the Supreme Court's

recent interpretation of the honest services provision in <u>Skilling</u> v. <u>United States</u>, No. 08-1394, 2010 WL 2518587 (U.S. June 24, 2010), a decision to which we will return in due course

In the second trial, although Driscoll was acquitted, Urciuoli was convicted on the same counts as in the first trial: thirty-five substantive counts of honest services mail fraud (corresponding to each payment check mailed to Celona) and one conspiracy count. The district court denied Urciuoli's motion for judgment of acquittal and his motion for a new trial, and sentenced him to 36 months' imprisonment.

Urciuoli now appeals from his conviction on three grounds, and we begin with his claim that the evidence was insufficient to prove the crimes charged. Urciuoli says that the government failed to provide sufficient evidence to establish either the essential actus reus--an exchange of salary payments for Celona's legislative action or forbearance--or the required mens rea--Urciuoli's intent that the salary payments serve as a corrupt quid pro quo bribe.

The government's evidence permitted the jury to find that Celona's work for the Village was modest given his ample salary (roughly $260,000 total between February 1998 and January 2004); that his limited work for the Village decreased over the years while his contract was renewed and his weekly fee rose (on Urciuoli's orders) from $700 to $892 to $1000; that he reported

-5-

more often to Driscoll and Urciuoli than to Village management; and that his salary was covered by RWMC and not the Village.

The jury could also find that Urciuoli hired Celona shortly after Celona had exerted legislative efforts in RWMC's favor; that others at RWMC and the Village thought Celona lacked the skills for the purported marketing work; and that Urciuoli renewed Celona's contract and increased his pay shortly after Celona's effort to, in Urciuoli's words, "crank around"--that is, to exert pressure on--one of the insurance companies with whom RWMC was negotiating about reimbursement. Evidence further showed that Urciuoli sought to hide the extent of RWMC's relationship with Celona.[2]

From this and other evidence, a rational jury could find that Urciuoli's purpose was for Celona to use his office on behalf of RWMC and that Celona did so, that the compensation nominally for marketing was in reality for Celona's misuse of his powers, and that the result was a conspiracy to deprive Rhode Island citizens of Celona's honest services as a Rhode Island senator. Because various mailings occurred in implementing the scheme, those mailings triggered the mail fraud statute, which expressly extends

_____

[2]Urciuoli denied to police, the press, and RWMC's board that Celona had participated in certain of the insurance company negotiations and had lobbied for RWMC. Urciuoli also arranged for Celona's contract with the Village to state that the Village would compensate Celona when the reality was that Sangermano had insisted that RWMC reimburse the Village for that compensation and RWMC in fact did so.

to honest services fraud. See note 1, above. The inferred conspiracy between Urciuoli and Celona was also adequately proved.

Urciuoli's counter-arguments are not persuasive. That Celona performed some marketing services did not prevent the jury from regarding the payments as primarily intended by Urciuoli to secure Celona's legislative help. Nor does it matter whether Celona expressly agreed to help RWMC on specific bills, for the jury could infer an understanding that he provide RWMC general support in exchange for money (even if occasionally opposing RWMC).[3] Urciuoli was free to make such arguments to the jury, but the jury could fairly reject them.

At greater length, Urciuoli argues that the jury should have been instructed on the Rhode Island state law "class exception" and that Urciuoli should be granted a new trial for the court's failure to so instruct. The class exception is a Rhode Island statute declaring that a state legislator privately employed does not have a conflict of interest with his legislative duties if the benefit that accrues to his employer from his actions is no more than that obtained by other employers in the same class. R.I. Gen. Laws § 36-14-7(b) (2010).

---

[3]See United States v. Kincaid-Chauncey, 556 F.3d 923, 943-47 (9th Cir.) (quid pro quo bribe need not be evidenced by any express agreement or statements of intent), cert. denied, 130 S. Ct. 795 (2009); United States v. Kemp, 500 F.3d 257, 284-85 (3d Cir. 2007) (same), cert. denied, 128 S. Ct. 1329 (2008).

-7-

Urciuoli argues, first, that concerns about federalism, fair notice, and the First Amendment right to petition the government require that state law be considered in determining the content of a state legislator's duties for which the failure to perform constitutes the deprivation of honest services under section 1346. But as we explained in Urciuoli I, "[n]othing in Rhode Island law purports to authorize or protect" quid pro quo bribery. 513 F.3d at 299; see also R.I. Gen. Laws §§ 11-7-3 to -4 (criminally prohibiting bribery of a state official). The class exception does not protect the conduct charged by the government.

The theory that non-disclosure of a conflict of interest was enough, even without a bribe, was advanced by the government in the first trial; but, stripping down its case, the government excluded any such theory from its opening argument, the revised indictment and its closing argument. And this time the jury instructions made it clear beyond peradventure that

> the Government must prove beyond a reasonable doubt that Defendant Urciuoli intended the payment to cause John Celona to alter his official acts, to change an official position that he would otherwise have taken or to take official actions that he would not have taken but for the payment

and that

> [t]he Government has charged honest services mail fraud based on a claim that John Celona was paid to perform certain official acts. Paying a legislator to perform political acts is not the same as employing a legislator in a job which creates a conflict of interest

-8-

between the legislator's political duties and his employment.

Urciuoli claims that the class exception was still relevant to his defense that he (Urciuoli) acted in good faith because he knew of the class exception (through his attorney's advice and through a Rhode Island Ethics Commission opinion that his attorney procured shortly after Celona signed his employment contract with the Village). But Urciuoli had full opportunity, which he used, to offer evidence of the opinion, the class exception and related testimony in support of his good faith claim.

The instruction Urciuoli sought stated in part that the class exception provision "expressly permits a legislator to take action on legislation that would affect a private entity for whom the legislator works as long as the legislation would affect that entity to no greater extent than any other similarly situated entities." This could easily have misled the jury into thinking the class exception could excuse bribery. It was also unnecessary to a fair presentation of Urciuoli's good faith defense. United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001).

Urciuoli also argues that four other requested instructions on state law should have been given, but his opening brief did not directly address these instructions, instead merely citing them, so claims of error are seemingly forfeited. Sandstrom v. Chemlawn Corp., 904 F.2d 83, 86 (1st Cir. 1990). In any event, the same objection applies as to the class exception instruction

-9-

already addressed: the instructions were not necessary to the defense and were quite likely to mislead the jury.

Finally, Urciuoli argues that Celona's facilitation of the insurance company meetings was not a misuse of his official powers and so was a legally insufficient basis for conviction. This very issue was addressed and decided adversely to Urciuoli in Urciuoli I, 513 F.3d at 296-97. But because the precise facts matter to the legal question and the evidence in the second trial differed from the first (mainly because Celona did not again testify), we revisit the issue briefly.

The second trial's evidence showed that Celona, at the time of the meetings, had become the chair of a committee with considerable power over health care legislation, and that both insurers--Blue Cross and United Healthcare ("United")--were regularly concerned with bills that were within the committee's purview. Looming in the background were proposed legislative changes on issues relevant to RWMC's disputes with the insurers: prompt reimbursement, "utilization review," and the legal status of "most favored nation" contract clauses.

The implicit threat of legislative action was brought to bear by Celona, who personally arranged for four of the meetings (three for Blue Cross and one for United) to be held in his State House office with Celona present. Urciuoli's and Celona's communications reveal that Urciuoli knew of and requested these

-10-

meetings and Celona's exertion of pressure on the insurers, and that Celona sought to advance RWMC's interests by his actions. Evidence also reflects that, on a couple of occasions, Celona resorted to direct pressure on the insurers as well.

So the jury could conclude, as we said before in Urciuoli I, that Celona was "misusing his official power over legislation--part of the honest services he owed to the citizens--to coerce Blue Cross and United into settlements with RWMC." 513 F.3d at 297. Legislators can and do convene meetings of constituents and seek to settle quarrels among them; but taking a bribe for the use of one's governmental power is a different matter and within the ambit of honest services fraud. Other precedent and legislative history support our interpretation of the statute.[4]

What distinguishes this aspect of the case from some others is that the bribe was not for Celona to press or oppose legislation directly through his votes; rather, the purchased use of official power was the implied threat of such action--and also the potential use of influence over legislation in committee--that Celona conveyed largely by implication through the orchestrated

---

[4]See United States v. Carbo, 572 F.3d 112, 115 (3d Cir. 2009) ("The most obvious form of honest services fraud is outright bribery of a public official."); H.R. 3050, 100th Cong. (1st Sess. 1987) (earlier proposed bill to amend the mail fraud statute would have redefined "defraud" to include defrauding of citizens "of their right to have the public business conducted honestly . . . free from bribery" (emphasis added)); see also Urciuoli I, 513 F.3d at 297.

meetings.  But the distance between this and paying outright for legislative votes is not great: both involve the misuse of office.

Urciuoli insists that the fair warning required by due process principles, Bouie v. City of Columbia, 378 U.S. 347, 350 (1964), and rule of lenity, United States v. Lanier, 520 U.S. 259, 266-67 (1997), require that the concept of "honest services" be read more narrowly.  Urciuoli's argument, however, rests primarily on generalities; nothing cited to us in the statute's language, history or case law suggests that the only honest services expected of a legislator are his or her casted votes.  We made this clear in Urciuoli I.  513 F.3d at 294, 296-98.

Through an evolution endorsed by Congress, the mail and wire fraud statutes have assumed a role in policing corruption in state government, and federal prosecutors have been willing to test the limits.  This court has sought to check perceived excesses in this case, see Urciuoli I, 513 F.3d at 294-96, and in others.[5]  But the evidence here allowed the jury to find that the employment contract payments were a bribe by which Urciuoli sought the misuse of Celona's office, and there was no legal error.

Well after the argument in this case and shortly before this decision was ready to issue, the Supreme Court decided

_____

[5]E.g., United States v. Sawyer ("Sawyer II"), 239 F.3d 31, 50 (1st Cir. 2001) (Boudin, J., concurring); United States v. Czubinski, 106 F.3d 1069, 1076-77, 1079 (1st Cir. 1997); Sawyer I, 85 F.3d at 722-34;

-12-

Skilling.  Urciuoli then sought leave to file a supplemental brief which we granted and a 15 page brief has been filed arguing that Skilling helps Urciuoli's position.  The government has offered to file its own brief, but this is unnecessary: Skilling is harmful to Urciuoli's position in certain respects and his attempt to use it in his favor, although imaginative, is hopeless.

Urciuoli's main use of Skilling is based on language in the opinion that he reads to narrow the mail fraud statute in honest services cases to cover only the party to a bribe who owes a fiduciary duty to the public (or some other entity entitled to honest services).  Skilling, 2010 WL 2518587, at *27 (noting that core honest service cases involve "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes" (emphasis added)).  Urciuoli owes no fiduciary duty to the public, he argues, and so he cannot violate the mail fraud statute.

That Urciuoli did not make this argument in the district court is not necessarily fatal in a "change of law case" but we need not decide the procedural issue, for Urciuoli's reading of Skilling is wrong.  Sections 1341 and 1346 by their terms cover anyone who engages in a "scheme" to deprive others of the intangible right to honest services.  The courts, as we will see, have consistently construed "scheme" in this context to mean that those who bribe public officials take part in a scheme to deprive

-13-

the public of the honest services of those they attempt to influence.

The sentence in Skilling relied upon by Urciuoli was merely identifying bribe and kickback cases as core honest services violations, distinguishing some less established scenarios to which some lower courts had extended the concept; nothing in Skilling's language or context suggests that the Court was distinguishing between the fiduciary who received the bribe and the non-fiduciary who gave it, a distinction that would conflict with the statute's language embracing those who participate in "any scheme . . . to defraud." 18 U.S.C. § 1341; see also 18 U.S.C. § 2 (2006) (one who induces a federal crime is liable as a principal).

Indeed, of the nine circuit court cases that Skilling cites as exemplars of "core" honest service fraud cases, two involve convictions of individuals who bribed another to violate his fiduciary duties. 2010 WL 2518587 at *27.[6] So, too, many of the twenty-eight cases cited by the government to the Court, e.g., United States v. Boffa, 688 F.2d 919 (3d Cir. 1982); United States

---

[6]United States v. Mandel involved the convictions of both the Governor of Maryland and the private individuals who bribed him. 591 F.2d 1347, 1359 & n.7 (4th Cir. 1979). Shushan v. United States, one of the earliest honest services cases, held that "[a] scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would . . . be a scheme to defraud the public." 117 F.2d 110, 115 (5th Cir. 1941). Skilling also cited United States v. Proctor & Gamble Co., convicting a company that bribed employees of its competitor to divulge trade secrets. 47 F. Supp. 676, 678 (D. Mass. 1942).

-14-

v. Lovett, 811 F.2d 979 (7th Cir. 1987), but we need not further gild the lily.

In the supplemental brief, Urciuoli invokes Skilling as he argues again that the government presented insufficient evidence to convict him of bribery. But the bribery theory is the only one pursued in the second trial here, the instructions conformed to it, and the evidence (as already noted) amply supported the jury's verdict. Urciuoli also reads Skilling as making state law relevant to defining honest services duties owed by a legislator but, however this may be, we have already explained that bribing a legislator is also unlawful under Rhode Island law.

Both claims--lack of evidence and reliance on state law-- reflect Urciuoli's claim that he was not paying Celona for official services and that Celona's conflict of interest was not itself unlawful under Rhode Island law. But, as we have already noted above, the well organized instructions given by the district judge required the jury to find that Urciuoli "intended the payment to cause John Celona to alter his official acts, to change an official position which he would otherwise have taken, or to take official actions that he would not have taken but for the payments."

Other language in the instructions made clear that employment of Celona for other purposes, even if a conflict of interest was thereby created, was not the basis for the government's charge and that "[i]n order to prove honest services

-15-

mail fraud the government must establish that the payments to John Celona were made with the specific purpose of influencing his actions on official matters."  In short, this case is the core bribery offense preserved by <u>Skilling</u>.

<u>Affirmed</u>.