United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued November 15, 2012          Decided January 25, 2013

No. 11-3100

UNITED STATES OF AMERICA,
APPELLEE

v.

KEVIN A. RING,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cr-00274-1)

————

*Timothy P. O'Toole*, appointed by the court, argued the cause and filed the briefs for appellant.

*Paul F. Enzinna*, *Jonathan Hacker*, and *Allen Dickerson* were on the brief for *amici curiae* National Association of Criminal Defense Lawyers, Inc., et al. in support of appellant.

*John-Alex Romano*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Lanny A. Breuer*, Assistant Attorney General, and *Nathaniel B. Edmonds*, Trial Attorney. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In 2004, a Department of Justice investigation into Jack Abramoff's lobbying team unearthed evidence of corruption so extensive that it ultimately implicated more than twenty public officials, staffers, and lobbyists. Appellant Kevin Ring, once a prominent Washington lobbyist, was one of them. Exposing the dark underbelly of a profession that has long played an important role in American politics, this case probes the boundary between legal lobbying and criminal conduct. Ring was convicted of honest-services fraud, paying an illegal gratuity, and conspiracy relating to his provision of meals, tickets, and other gifts to public officials. On appeal, Ring argues that the district court's instructions on the honest-services counts misstated the law, that the jury lacked sufficient evidence to find that an "official act" underlay the illegal-gratuity charge, and that the district court ran afoul of Federal Rule of Evidence 403 and the First Amendment when it admitted evidence of his lawful campaign contributions. Although each of these arguments is weighty, we ultimately affirm Ring's conviction.

**I.**

Lobbying has been integral to the American political system since its very inception. *See* 1 Robert C. Byrd, The Senate 1789–1989: Addresses on the History of the United States Senate 491–92 (Mary Sharon Hall, ed., 1988). As some have put it more cynically, "[l]obbyists have besieged the U.S. government for as long as it has had lobbies." Peter Grier, "The Lobbyist Through History: Villainy and Virtue," The Christian Science Monitor, Sept. 28, 2009,

http://www.csmonitor.com/USA/Politics/2009/0928/the-lobbyist-through-history-villainy-and-virtue. By 2008, the year Ring was indicted, corporations, unions, and other organizations employed more than 14,000 registered Washington lobbyists and spent more than $3 billion lobbying Congress and federal agencies. *See* Lobbying Database, Center for Responsive Politics, http://www.opensecrets.org/lobby/index.php (compiling data from the Senate Office of Public Records).

The interaction between lobbyists and public officials produces important benefits for our representative form of government. Lobbyists serve as a line of communication between citizens and their representatives, safeguard minority interests, and help ensure that elected officials have the information necessary to evaluate proposed legislation. Indeed, Senator Robert Byrd once suggested that Congress "could not adequately consider [its] workload without them." 1 Byrd, The Senate 1789–1989, at 508.

In order to more effectively communicate their clients' policy goals, lobbyists often seek to cultivate personal relationships with public officials. This involves not only making campaign contributions, but sometimes also hosting events or providing gifts of value such as drinks, meals, and tickets to sporting events and concerts. Such practices have a long and storied history of use—and misuse. During the very First Congress, Pennsylvania Senator William Maclay complained that "New York merchants employed 'treats, dinners, attentions' to delay passage of a tariff bill." *Id.* at 492. Sixty years later, lobbyists working to pass a bill that would benefit munitions magnate Samuel Colt "stage[d] lavish entertainments for wavering senators." *Id.* at 493. Then, in the 1870s, congressmen came to rely on railroad lobbyists for free travel. *See id.* at 494. Indeed, one railroad tycoon

complained that he was "averag[ing] six letters per day from Senators and Members of Congress asking for passes over the road." *Id.*

The ubiquity of these practices perhaps explains why in Steven Spielberg's film *Lincoln* a lobbyist declared, "It is not illegal to bribe congressmen—they'd starve otherwise." Although public officials certainly benefit from lobbyists' campaign contributions and other gifts, that quip, of course, is not precisely accurate. To be sure, bribing congressmen *is* illegal, but gifts given by lobbyists to curry political favor do not always amount to bribes. At least prior to legislation enacted in the wake of the Abramoff scandal, *see* Honest Leadership and Open Government Act of 2007, Pub. L. No. 110-81, 121 Stat. 735, there was nothing criminal about giving gifts to an official in an attempt "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999). The line between legal lobbying and criminal conduct is crossed, however, when a gift possesses a particular link to official acts. *See id.* at 405–08 ("link" or "connection" between gift and official act distinguishes lawful from unlawful gifts). Specifically, when the gift is given with an "intent 'to influence' an official act" by way of a corrupt exchange—i.e., a quid pro quo—a defendant has committed bribery or honest-services fraud. *See id.* at 404 (quoting 18 U.S.C. § 201(b)(1)). When a gift is intended as a "reward" for a specific past or future official act, a defendant has paid an illegal gratuity. *See id.* at 405; 18 U.S.C. § 201(c)(1)(A). The distinction between legal lobbying and criminal conduct may be subtle, but, as this case demonstrates, it spells the difference between honest politics and criminal corruption.

Appellant Kevin Ring, after stints working for a member of the U.S. House of Representatives, a U.S. Senate committee, and the House Republican caucus, joined Jack Abramoff's lobbying team in 1999. Until its fall from grace, Abramoff's group maintained a successful and wide-ranging lobbying practice in Washington, D.C. Playing a role some characterized as the team's "chief operating officer," Ring managed some of Abramoff's most important clients and maintained close relationships with several public officials.

Ring and the other Abramoff lobbyists relied heavily on campaign contributions to maintain relationships with elected officials and promote their clients' political interests. But it was Ring's other lobbying tactics that got him in trouble. These tactics chiefly included treating congressional and executive branch officials to dinners, drinks, travel, concerts, and sporting events. Ring referred to officials with whom he had the closest ties and with whom his lobbying efforts were most successful as his "champions." As regular beneficiaries of Ring's largesse, these "champions" often took actions that were favorable to Ring's clients.

In 2004, a targeted federal investigation of a kickback scheme masterminded by Abramoff and another of his associates, Michael Scanlon, spawned the broader investigation that ultimately ensnared Ring. Discovering that meals, tickets, and travel Ring provided to public officials were impermissibly linked to official acts that benefitted Ring and his clients, the government indicted him on six counts of honest-services fraud, one count of paying an illegal gratuity, and one count of conspiracy to pay illegal gratuities and commit honest-services fraud. After his first trial resulted in a hung jury, the district court postponed retrial to await the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), its landmark honest-services case. Then,

following a two-week trial, a jury convicted Ring on three of the six honest-services counts, the illegal gratuity count, and the conspiracy count. Ring was sentenced to twenty months' incarceration, but the district court, observing that his case "presented challenging and novel questions of law," stayed that sentence pending appeal.

Ring now challenges the district court's instructions on the honest-services counts, the sufficiency of the evidence on the illegal-gratuity count, and the admission of evidence of his lawful campaign contributions. We consider each argument in turn.

## II.

The honest-services fraud statute, 18 U.S.C. § 1346, extends the general mail- and wire-fraud statute to include not only schemes to defraud another of money or property, but also "scheme[s] or artifice[s] to deprive another of the intangible right of honest services." In *Skilling*, the Supreme Court adopted a limiting construction of the statute in order to save it from unconstitutional vagueness. Specifically, the Court held that the honest-services fraud statute "covers only bribery and kickback schemes." 130 S. Ct. at 2907. Consistent with *Skilling*, the government prosecuted Ring on a bribery theory of honest-services fraud. As both parties agree, this means that the government had to prove the major elements of bribery in order to convict Ring of honest-services fraud. As relevant to the issue here, the government had to show that Ring gave gifts with an "intent 'to influence' an official act" by way of a corrupt quid pro quo. *See Sun-Diamond*, 526 U.S. at 404 (quoting 18 U.S.C. § 201(b)(1)).

Ring argues that the district court's instructions on the quid pro quo element were flawed in three respects. Specifically, he contends that the instructions failed to make

clear (1) that an *explicit* quid pro quo was required, (2) that the official must *agree* to the exchange, and (3) that, at the very least, a corrupt agreement must be *offered*. Whether the district court properly instructed the jury is "a question of law that we review *de novo*." *United States v. Orenuga*, 430 F.3d 1158, 1166 (D.C. Cir. 2005). In reviewing challenges to instructions, our task is to " 'determine whether, taken as a whole, [the instructions] accurately state the governing law.' " *Id.* (quoting *United States v. DeFries*, 129 F.3d 1293, 1303 (D.C. Cir. 1997) (per curiam)) (alteration in original). After considering each of Ring's three challenges—the explicitness argument, the agreement argument, and the offer argument—we conclude that the district court's careful instructions correctly stated the law of honest-services bribery.

## A.

In *McCormick v. United States*, 500 U.S. 257 (1991), the case on which Ring primarily relies, the Supreme Court held that making campaign contributions can constitute criminal extortion under the Hobbs Act only when made pursuant to an explicit quid pro quo agreement. *See id.* at 271–74. *McCormick* expressly declined to decide whether this requirement "exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at 274 n.10. Ring urges us to resolve the question *McCormick* left open and hold that a lobbyist's provision of other "things of value" to public officials cannot constitute honest-services bribery absent an explicit quid pro quo agreement. Like contributing to political campaigns, Ring maintains, lobbying implicates core First Amendment rights—specifically, the right to petition the government. Criminalizing implicit agreements to exchange things of value for official acts, he further contends, would result in confused juries convicting on the basis of constitutionally protected conduct and chill First Amendment activity.

The *McCormick* Court failed to clarify what it meant by "explicit," and subsequent courts have struggled to pin down the definition of an explicit quid pro quo in various contexts. *See United States v. McGregor*, No. 10-cr-186, 2012 WL 3010971 at *4–10 (M.D. Ala. 2012) (collecting cases and navigating various courts' pronouncements about the meaning of "explicit"). It is thus understandable that Ring fails to explain exactly what the addition of an explicitness requirement would mean in practice. In any event, we think it clear that no such instruction is required outside the campaign contribution context.

As an initial matter, we assume without deciding a proposition that Ring appears to take for granted: that *McCormick*, which concerned extortion, extends to honest-services fraud. *Cf. United States v. Siegelman*, 640 F.3d 1159, 1172–74 & n.2 (11th Cir. 2011) (assuming without deciding that *McCormick* applies to federal-funds bribery and honest-services fraud). But even assuming as much, we believe that campaign contributions can be distinguished from other things of value. *See, e.g.*, *United States v. Ganim*, 510 F.3d 134, 142–44 (2d Cir. 2007) (explaining that *McCormick* requires "proof of an express promise" in the contribution context, but that an "agreement may be implied" in "the non-campaign context"). For one thing, whereas soliciting campaign contributions may be practically "unavoidable so long as election campaigns are financed by private . . . expenditures," *McCormick*, 500 U.S. at 272, accepting free dinners is certainly not. Moreover, although providing information, commenting on proposed legislation, and other lobbying activities implicate First Amendment speech and petition rights, *see Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("[E]very person or group engaged . . . in trying to persuade Congressional action is

exercising the First Amendment right of petition."), the First Amendment interest in giving hockey tickets to public officials is, at least compared to the interest in contributing to political campaigns, de minimis. Accordingly, to the extent concerns about criminalizing politically necessary activity or chilling constitutionally protected conduct justify imposing a higher bar for criminalizing campaign contributions, such concerns carry significantly less weight with respect to other things of value.

**B.**

Having rejected Ring's argument that an *explicit* quid pro quo is required outside the contribution context, we next address his contention that the district court nonetheless erred by instructing the jury that "[i]t [was] not necessary for the government to prove that . . . the public official actually accepted the thing of value or agreed to perform the official act or participated in the scheme or artifice to defraud." That the official must actually enter into a corrupt agreement, Ring maintains, flows from the Supreme Court's admonition that bribery requires "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act," *Sun-Diamond*, 526 U.S. at 404–05, from the need to distinguish bribery from illegal gratuity, and from our decision in *United States v. Dean*, 629 F.3d 257 (D.C. Cir. 2011).

Ring's position is foreclosed by the text and structure of the federal bribery statute, which both parties agree serves as the benchmark for honest-services bribery, as well as by binding precedent. The bribery statute expressly criminalizes a mere "offer" of something of value with the intent to influence an official act. 18 U.S.C. § 201(b)(1). That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which

defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe. *See id.* § 201(b)(1)–(2). Confirming this interpretation, the Supreme Court held in *United States v. Brewster*, 408 U.S. 501 (1972), that, with respect to a bribe *payee*, the "acceptance of the bribe is the violation of the statute." *Id.* at 526. The parallel proposition in the context of a bribe *payor* is straightforward: the offer of the bribe is the violation of the statute. Indeed, we have made clear that the quid pro quo need not be "fully executed for the act to be considered a bribe." *Orenuga*, 430 F.3d at 1166.

Because bribery does not require the official to agree to or actually complete a corrupt exchange, neither does honest-services fraud by bribery. Although we need look no further than black-letter bribery law to reach this conclusion, the fact that the wire fraud statute " 'punishes the scheme, not its success,' " *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (quoting *United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000)), lends further support to our conclusion that a defendant may be guilty of honest-services bribery where he offers an official something of value with a specific intent to effect a quid pro quo even if that official emphatically refuses to accept. In other words, though the offerer of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent. *See United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974) (bribe payer's culpability may differ from official's culpability).

Contrary to Ring's argument, moreover, the proposition that the official need not agree to accept a proffered bribe hardly renders bribery, or honest-services fraud by bribery, indistinguishable from illegal gratuity, which criminalizes gifts given "for or because of," 18 U.S.C. § 201(c)—as opposed to with an intent "to influence," *id.* § 201(b)—an official act. Indeed, the Supreme Court directly answered this

objection in *United States v. Sun-Diamond Growers of California*, explaining that "[t]he distinguishing feature of each crime is its intent element," not any action taken by another party. 526 U.S. at 404. Specifically:

> Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Id.* at 404–05 (quoting 18 U.S.C. §§ 201(b)–(c)). Thus, it is the "specific intent to give or receive something of value in exchange for an official act," *id.* (emphasis omitted), an element on which the jury in this case was carefully instructed, that preserves the distinction between bribery and gratuity.

Nothing in *Dean* requires a different result. There, we overturned a conviction for solicitation of a bribe, holding that bribery "necessitates an *agreement* between the public official and the other party that the official will perform an official act in return for a personal benefit to the official." 629 F.3d at 259. Leaning heavily on the word "agreement," Ring maintains that *Dean* stands for the proposition that an official must "agree" to accept a bribe for the requisite quid pro quo to occur. But in context it is clear that "agreement" is used as a synonym for specific intent. When, as in *Dean*, a public official is charged with *soliciting* a bribe, the evidence must

show that the official conveyed an intent to perform official acts in exchange for personal benefit. Accordingly, the element absent in *Dean* is precisely what is present here: an intent to offer or solicit an exchange of official action for personal gain.

## C.

Finally, we turn to Ring's more nuanced argument that even if an official need not *agree* to a corrupt exchange, the payor defendant must at least intend to *offer* such an exchange. This argument, with which the government appears to agree, *see* Oral Arg. Tr. 25:19–26:11; Appellee Br. 29, was initially proffered by amici and adopted as a "fallback" by Ring. *See* Oral Arg. Tr. 13:5. But we agree with the government that the district court's instructions faithfully capture this requirement. After explaining the quid pro quo element, the instructions stated that "[t]he defendant must intend that the public official realize or know that he or she is expected, as a result of receiving this thing of value, to exercise particular kinds of influence or decision-making to benefit the giver as specific opportunities to do so arise. . . . [T]his *quid pro quo*," the instructions continued, "must include a showing that the things of value either were conditioned upon the performance of an official act or pattern of acts or upon the recipient's express or implied agreement to act favorably to the donor when necessary."

These careful instructions touched all the necessary bases, requiring a specific intent to influence official acts, an intent that the official "realize or know" that the corrupt exchange is being proposed, and a showing that the gifts "were conditioned upon" the official's act or agreement. They also comport with instructions approved by other circuits. In *United States v. Uricuoli*, 613 F.3d 11 (1st Cir. 2010), for instance, the First Circuit upheld instructions that required the

government to prove that the defendant "intended the payment to cause [the official] to alter his official acts," *id.* at 15, and that "the payments to [the official] were made with the specific purpose of influencing his actions on official matters," *id.* at 18.

To be sure, the district court focused more on Ring's intent than on his conduct. But that focus mirrors the Supreme Court's in *Sun-Diamond*, which defined the quid pro quo element not in terms of a defendant's conduct, but rather in terms of a defendant's "*specific intent* to give or receive something of value in exchange for an official act." 526 U.S. at 404–05 (emphasis added and other emphasis omitted). In the end, it is this *mens rea* element that distinguishes criminal corruption from commonplace political and business activities.

## III.

Ring's next argument takes us from the honest-services fraud charges to the sole illegal-gratuity count. As we have already explained, the illegal-gratuity statute makes it unlawful to "give[ ], offer[ ], or promise[ ] anything of value to any public official . . . for or because of any official act." 18 U.S.C. § 201(c). The statute defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* § 201(a)(3). This Circuit treats the question whether an action constitutes an "official act" as one of "sufficiency of the evidence." *See Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc).

Ring was charged with paying an illegal gratuity when he gave Washington Wizards tickets to an attorney at the Justice Department's Office of Intergovernmental Affairs as a reward for helping to expedite review of a visa application for a foreign student seeking to attend a private school owned by Abramoff. Upon receiving a request for assistance from Ring, the attorney forwarded Ring's email to another Justice Department official who recommended he contact someone at the U.S. Immigration and Naturalization Service ("INS"). Following this advice, the attorney called an INS official's secretary and urged her to expedite the application. He then forwarded Ring's email to the secretary along with a personal note:

> Thank you for looking into this. I do not know if anything can be done but I said I would look into it. If, for any reason, nothing can be done, please email me so I can pass that along. Thank you very much for you[r] assistance.

The secretary, in turn, passed the email along to five different INS officials in an effort to, as she testified, "make sure . . . action was being taken to answer the request" because it had come from "higher headquarters" at the Department of Justice. Within a single business day, INS agreed to expedite the application. After getting the news that the attorney's efforts had been successful, Ring sent Abramoff an email reporting that the attorney had "[h]elped on the school and [was] now looking for tickets" to two Washington Wizards basketball games. Abramoff promptly agreed, and the attorney attended the games on Abramoff's dime.

By convicting on the illegal-gratuity count, the jury found—and Ring does not now dispute—that he provided the tickets "for or because of" the attorney's assistance with the

visa application. Instead, Ring argues that the government failed to offer sufficient evidence that the attorney took an "official action" within the meaning of the illegal-gratuity statute.

In *Valdes v. United States*, this Court, sitting en banc, considered the scope of "official act" in the illegal-gratuity context. There, a police officer accepted money from an undercover agent and, at the agent's request, conducted searches of license-plate and warrant databases. *See* 475 F.3d at 1321–22. Emphasizing that the illegal-gratuity statute is concerned not with purely informational inquiries, but rather with "inappropriate influence on decisions that the government actually makes," *id.* at 1325, we held that the jury lacked sufficient evidence to find that the officer's searches constituted "official acts," *id.* at 1322–25. In so doing, we listed some examples of acts that "the statute easily covers: a clerk's manufacture of official government approval of a Supplemental Security Income benefit, as in *United States v. Parker*, 133 F.3d 322 (5th Cir. 1998); a congressman's use of his office to secure Navy contracts for a ship repair firm, as in *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988); and a Veterans' Bureau official's activity securing a favorable outcome on a disability claim, as in *Beach v. United States*, 19 F.2d 739 (8th Cir. 1927) (based on a predecessor statute)." *Valdes*, 475 F.3d at 1325. We further noted that "official acts" include acts that have been established as part of an official's position by virtue of past practice or custom. *See id.* at 1323.

Ring maintains that, like in *Valdes*, this is a case in which no reasonable juror could have found that the attorney's forwarding of the email constituted an "official act." Because the attorney lacked decisionmaking authority with respect to visa applications, Ring argues that the attorney's intercession was not a "decision or action" on a "question, matter, . . . [or]

proceeding" that was or ever would be "pending" or "brought" before him. 18 U.S.C. § 201(a)(3). Instead, according to Ring, the attorney's act of forwarding the email to the INS secretary amounts to nothing more than an informational inquiry, analogous to the database search in *Valdes* or a receptionist's transfer of a phone call.

Considering the evidence in the light most favorable to the government, as we must, *see Valdes*, 475 F.3d at 1322, we think it clear that a rational jury could have found that the attorney's efforts to expedite the visa application qualified as official action. The secretary who received the attorney's email testified that the Justice Department's Intergovernmental Affairs Office was part of INS's "higher headquarters" and was "responsible for . . . assisting other agencies and other state and local governments if they ha[d] an issue." In other words, unlike attorneys in DOJ units who litigate on behalf of agency clients, attorneys in the Intergovernmental Affairs Office are responsible for reaching across agency boundaries to get things done. And as the secretary went on to explain, she felt unable to ignore the attorney's request because of the office he held. Ultimately, the attorney's swift success in procuring expedited review spoke for itself.

Contrary to Ring's contention, the attorney's actions are categorically different from those *Valdes* suggests fall outside the scope of "official action." Unlike the *Valdes* police officer, the attorney was neither "moonlighting" nor making a purely informational inquiry. *See Valdes*, 475 F.3d at 1324–25. Rather, the attorney acted in his official capacity to *influence* the visa application process, conduct better analogized to an action *Valdes* explained was clearly within the statute's coverage: "a congressman's use of his office to secure Navy contracts for a ship repair firm." *Id.* at 1325. To

be sure, the attorney himself lacked independent authority to expedite visa applications. But Ring's attempt to import a requirement that the official in question have ultimate decisionmaking authority into the definition of "official act" has no statutory basis. *Cf. United States v. Carson*, 464 F.2d 424, 433–34 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision."). Indeed, the statute states that "official act[s]" include *both* "decision[s]" *and* "action[s]." 18 U.S.C. § 201(a)(3).

## IV.

This brings us to Ring's final contention—that the district court ran afoul of Federal Rule of Evidence 403 as well as the First Amendment by permitting the jury to draw adverse inferences from evidence about his campaign contributions. Although the government never contended that any of Ring's campaign contributions were themselves unlawful, it repeatedly introduced testimony about those contributions in order to paint a fuller picture of his interactions with public officials. It also used Ring's contributions to demonstrate that he viewed money as a means to his clients' political ends. For example, the government introduced an email in which Ring asked Abramoff to make sure that a particular congressman who had acted as "a good soldier" received "his fair share of contributions." And one witness testified that Ring had a "running joke" in which he would hold up a client's campaign check and ask, "Hello quid. Where's the pro quo?" Tr. 10/28/10 PM at 22:2–13.

The district court recognized that this sort of evidence posed a close question under Federal Rule of Evidence 403,

which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." Finding on the one hand that the contributions were "so intertwined and so integrally part of what [Ring] did" and that contribution evidence helped shed light on his modus operandi, and on the other that the evidence was not especially prejudicial, the district court ultimately admitted it. To avoid confusion and prejudice, however, the district court repeatedly reminded the jury— indeed, virtually every time campaign contribution evidence was presented—that such contributions are legitimate lobbying tools and that the jury must not consider the lawfulness of Ring's contributions in reaching its verdict. *See, e.g.*, Trial Tr. 10/25/10 AM at 22:7–24:7. Pressing the same point, the district court's final jury instructions emphasized that "the propriety or legality of any campaign contributions . . . [was] not before [the jury] and [the jury was] therefore instructed not to consider campaign contributions . . . as part of the illegal stream of benefits that Mr. Ring [was] charged with providing to certain public officials."

Although the district court viewed this question primarily in Rule 403 terms, Ring's challenge to the admission of this evidence intertwines First Amendment– and Rule 403–based lines of reasoning. To the extent Ring's First Amendment argument is distinct, it rests on the proposition that permitting a jury to draw adverse inferences from constitutionally protected activity violates a defendant's First Amendment rights. Although the First Amendment limits the government's authority to criminalize speech and other protected activity, *see, e.g.*, *United States v. Stevens*, 130 S. Ct. 1577 (2010), the Supreme Court has made clear that the Amendment simply "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive

or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Nothing in *McCormick*—which is silent on the use of campaign contributions as evidence of *other* criminal activity—suggests that contributions are an exception to that general rule.

Ring is left, then, with Rule 403 and the possibility that the First Amendment, even if it imposes no independent bar on the admission of campaign contribution evidence, plays some role in the Rule 403 analysis. Critical to our resolution of this issue, we review a trial judge's application of Rule 403 for "abuse of discretion" because "we assume that the trial judge generally is in the best position to balance the probative value of the disputed evidence against the risks of prejudice and confusion." *Henderson v. George Washington University*, 449 F.3d 127, 133 (D.C. Cir. 2006). Although a trial court's discretion to admit evidence under Rule 403 is not "unfettered," appellate courts must be "extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge." *Id.*

Beginning with the plus side of the Rule 403 balance sheet, we agree with the district court that the campaign-contribution evidence had significant probative value. Testimony about Ring's lawful campaign contributions gave jurors a window into the way in which lobbyists like Ring gain influence with public officials. One witness explained the role of campaign contributions in Abramoff's lobbying practices with a particularly striking metaphor:

> Q: Did you ever lobby with campaign contributions?
>
> A: Yes.

Q: How did you do that?

A: Campaign contributions are a little bit different than, for lack of a better term, things of value. I viewed campaign contributions as sort of the ante in a poker game. It's the price of being involved in the game. We worked—we worked aggressively to raise money and we liked to do it.

Q: What do you mean by that, you viewed campaign contributions as the ante in a poker game?

A: Yeah, it's a seat at the table. That's all. That's all it is.

Trial Tr. 10/28/10 PM 21:9–20. In other words, under the government's theory of the case, campaign contributions gave the lobbyists access to public officials. Without such evidence, a jury might wonder why an official would sacrifice his integrity for a few Wizards tickets. Perhaps even more significantly, the contribution testimony amounted to strong modus operandi evidence that demonstrated Ring's transactional relationship with officials and the manner in which he pursued his clients' political aims. That Ring rewarded "good soldier[s]" with campaign contributions, for example, perhaps suggests that he put other things of value to similar use.

Turning to the other side of the Rule 403 ledger, we think it similarly clear that the contribution evidence had a strong tendency to prejudice, confuse, and mislead the jury. As the Supreme Court explained in *Old Chief v. United States*, 519 U.S. 172 (1997), "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from

proof specific to the offense charged." *Id.* at 180. The Committee Notes to Rule 403 explain, " '[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, Fed. Rule Evid. 403. Here, the government introduced the jury to a group of lobbyists who "viewed campaign contributions as . . . the ante in a poker game," Trial Tr. 10/28/10 PM 21:13–14, and to a defendant who held "$300,000 in checks" in his hand and joked, "Hello, quid. Where's the pro quo?" *Id.* at 22:6–24. The distasteful way in which Ring spoke of campaign contributions—especially in light of the heated national debate about the proper role of money in politics—posed a significant risk of evoking precisely the kind of negative emotional response that might "lure the [jury] into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180.

The evidence may have been even more confusing and misleading than it was prejudicial. Asked to find whether Ring engaged in a corrupt "quid pro quo" with respect to meals and tickets, the jury was presented with testimony—*e.g.*, "Hello, quid. Where's the pro quo?" Trial Tr. 10/28/10 PM 22:2–25—that Ring viewed contributions in *precisely* those terms. Indeed, through its questioning the government invited the jury to conflate the contribution evidence with evidence about the things of value that were actually at issue. After eliciting testimony about contributions, for example, the prosecution asked this series of questions:

> Q: In that conversation or at any other time, did Kevin Ring tell you that he treated campaign contributions any differently than he did the giving of tickets to public officials?

. . .

A: I don't remember a conversation like that.

Q: What about campaign contributions and meals or food, giving of meals or food to public officials?

. . .

Q: I'm asking whether or not Mr. Ring ever had any conversations that he treated campaign contributions differently than he treated the giving of meals and tickets to public officials?

A: I don't remember any conversations like that, no, sir.

Q: What about the treatment of the giving of trips to public officials?

A: Again, I don't remember any conversations like that.

Trial Tr. 10/27/2010 AM at 127:2–128:3.

Having laid out both sides of the Rule 403 balance sheet, we come to the question whether the contributions' status as protected speech affects the analysis. For his part, Ring fails to specify exactly what role constitutional considerations should play and neglects to grapple with the consequences and limitations of his position. But the strongest version of his argument, we think, is that concerns about jury prejudice and confusion should carry more weight in the context of core First Amendment activity. Although there appears to be little

support for such a holding, injecting the First Amendment into the Rule 403 balance in this way would resonate with First Amendment–specific "chilling" concerns—concerns that are especially powerful where political speech is involved. *See, e.g.*, *Brown v. Hartlage*, 456 U.S. 45, 61 (1982). In this case, however, we need not decide whether and precisely how the First Amendment alters the Rule 403 analysis because, even assuming First Amendment concerns justify placing a thumb on the prejudice and confusion side of the scale, that added weight fails to change the outcome of the balance.

Although Ring's argument for excluding the evidence is powerful, we are mindful that the question at this stage is not whether we would have come to the same conclusion as the district court in the first instance, but whether the district court abused its discretion. In answering that question, we think it significant that the district court repeatedly instructed the jury that the campaign contributions were not illegal. Although "curative instructions are no panacea," *Dallago v. United States*, 427 F.2d 546, 552 n.13 (D.C. Cir. 1969), the fact that the instruction was repeated every time contribution evidence arose—as opposed to being given only a single time at the end of a trial throughout which jurors may have failed to distinguish contribution evidence from other evidence—did much to mitigate the potential for confusion and First Amendment chilling, even if it could not have entirely eliminated the potential for prejudice. Moreover, the probative value of the contribution evidence and the extent to which it was inexorably intertwined with other evidence weighed heavily in favor of admission. In the end, we cannot say that the district court abused its discretion by concluding that the evidence's probative value was not "substantially outweighed" by its prejudicial tendencies. Fed. R. Evid. 403. After all, Rule 403 "tilts . . . toward the admission of evidence

in close cases," *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984), and this case is nothing if not close.

## V.

For the foregoing reasons, we affirm.

*So ordered.*