# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 12, 2013      Decided August 12, 2014

No. 11-3080

UNITED STATES OF AMERICA,
APPELLEE

v.

FRASER VERRUSIO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00064-1)

*Richard P. Sobiecki* argued the cause for appellant. With him on the briefs were *A.J. Kramer*, Federal Public Defender, *Rosanna M. Taormina*, Assistant Federal Public Defender, and *Vernon A.A. Cassin III*.

*Kirby A. Heller*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Lanny A. Breuer*, then Assistant Attorney General, and *John D. Buretta*, then Deputy Assistant Attorney General. *Michael A. Rotker*, Attorney, U.S. Department of Justice, entered an appearance.

*Kerry W. Kircher*, General Counsel, U.S. House of Representatives, *William Pittard*, Deputy General Counsel, *Christine M. Davenport*, Senior Assistant Counsel, and *Todd B.*

*Tatelman*, *Mary Beth Walker*, and *Eleni M. Roumel*, Assistant Counsel, were on the brief for *amicus curiae* Bipartisan Legal Advisory Group of the United States House of Representatives in support of appellee.

Before: GARLAND, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Fraser Verrusio, the former policy director of the House Transportation Committee, was convicted on three counts relating to his receipt of illegal gratuities from Jack Abramoff's lobbying group. On appeal, Verrusio argues that his indictment omitted an essential element of the charges against him, that the evidence at trial was insufficient to sustain his convictions, and that the district court erred in excluding a defense exhibit and quashing a defense subpoena. For the reasons set forth below, we affirm the judgment of the district court.

I

Verrusio's convictions arose out of his work as policy director for the Committee on Transportation and Infrastructure of the U.S. House of Representatives. As policy director, he advised Chairman Don Young, as well as the Committee as a whole, regarding legislative strategies and policy. *See, e.g.*, Supp. App. 22 (Blackann Test.); *id.* at 46 (Harless Test.).[1] The House Transportation Committee had jurisdiction over legislation authorizing federal surface transportation funding, which required renewal every six years. Because the federal

---

[1] All citations to Supp. App. refer to the Government's Supplemental Appendix.

highway act in force in 2003 -- known as the Transportation Equity Act for the Twenty-First Century (TEA-21) -- was set to lapse at the end of that year, the Committee was especially focused on enacting the next federal highway bill.

A

Companies and their lobbyists were also focused on the new highway bill. One of those companies was United Rentals, a nationwide construction equipment company. United Rentals hired lobbyists from Jack Abramoff's group at the Greenberg Traurig law firm to advance its legislative agenda.[2] The lobbyists were Todd Boulanger and James Hirni.[3] Todd Ehrlich was their primary contact at United Rentals.

Because its business was renting construction equipment, United Rentals wanted language in the federal highway bill that would provide incentives for state transportation departments to contract with builders that rented rather than bought such equipment. It also wanted language that would require liability insurance at a level that few companies other than United Rentals had. In addition, it wanted language encouraging the use of "intelligent" transportation systems like the ones United Rentals had to offer. App. 187 (Boulanger Test.). Together, Boulanger, Hirni, and Ehrlich devised a plan to insert three

_____

[2]For cases describing the FBI's "corruption investigation into the activities of former lobbyist Jack Abramoff," *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1087 (D.C. Cir. 2014), see *id.*; *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013); *United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011).

[3]Hirni worked for another law firm from February 2003 through December 2003. He then moved to Greenberg Traurig.

amendments into the highway bill, all of which were intended to give United Rentals a competitive advantage. *Id.* Boulanger, Hirni, and Ehrlich all testified at Verrusio's trial.

So, too, did Trevor Blackann. In 2003, Blackann was a legislative assistant to Senator Kit Bond, who, at the time, chaired the Subcommittee on Transportation and Infrastructure of the Senate Committee on the Environment and Public Works. The Subcommittee had primary responsibility for drafting the Senate version of the new federal highway bill. As a result, Blackann was in a position to be helpful in adding United Rentals' desired amendments to the bill. *See id.* at 191, 196-97 (Boulanger Test.).

Boulanger and Hirni discussed United Rentals' "package of proposals" for legislation with Blackann. App. 220 (Blackann Test.). That discussion included details of the three specific amendments the company wanted. According to Blackann, the amendments were aimed at "providing preferential treatment in federal government contracting for renting or leasing equipment as opposed to purchasing equipment"; a "minimum insurance requirement"; and a "work zone safety piece," including intelligent transportation systems. *Id.*

After Blackann discussed United Rentals' desired legislative package with lobbyists Boulanger and Hirni, he then discussed it with Verrusio. He did so, he testified, because he knew from the lobbyists "that they were also working with Mr. Verrusio on the same package of amendments." *Id.* Blackann said that he and Verrusio anticipated opposition to United Rentals' desired amendments from companies that sold construction equipment, and that they "discussed the idea of waiting till the last possible minute legislatively to insert the provisions." *Id.* at 221. Blackann termed this the "airmail strategy." *Id.* According to Blackann, Verrusio was adamant

that this was the route that United Rentals should take. *Id.* Blackann advised lobbyists Boulanger and Hirni that he and Verrusio "were both in support of [the airmail] strategy." *Id.*

In October 2003, after the above-described discussions had taken place, United Rentals' Ehrlich told lobbyist Boulanger that he had tickets to the first game of the 2003 World Series, and he asked "if there were any government officials that [United Rentals] would be interested in taking that could be helpful" in advancing its legislative agenda. App. 188 (Boulanger Test.). Ehrlich and Boulanger, in conjunction with Hirni, decided to invite Blackann and Verrusio. According to Boulanger, they decided to invite them because "they were in positions to be helpful . . . [s]pecifically" with "[t]he United Rentals' amendments that we were seeking to include in the highway bill." Supp. App. 19-20 (Boulanger Test.). Boulanger knew that Verrusio "was close to the chairman" of the House Transportation Committee, and he hoped "to influence" Verrusio "to do some things for our clients." App. 188 (Boulanger Test.); Supp. App. 21 (same). At trial, Hirni similarly admitted that he had used the "tickets in [an] attempt to influence the Congressional staff for legislation." Supp. App. 85.

As planned, Hirni invited Blackann and Verrusio to the World Series game and made clear that United Rentals would cover the costs. App. 251-52 (Hirni Test.). Both men accepted the invitation. *Id.* at 250-51. Hirni and Blackann flew to New York together and met Ehrlich there. Over drinks, Blackann described the airmail strategy that he, Verrusio, and the two lobbyists had agreed was "the best course of action." Supp. App. 26 (Blackann Test.). Shortly thereafter, Verrusio joined them for dinner. According to Hirni, the four men "talked a lot about United Rentals" and "got into a conversation about concepts and ideas United Rentals had for federal legislation."

*Id.* at 64 (Hirni Test.). Verrusio was "the senior guy at the table," Blackann testified, and was "leading the conversation." *Id.* at 27. Verrusio "walked them through" the airmail strategy, indicating that it had "the best chance for ultimate success." *Id.* Ehrlich paid for the dinner and drinks. *Id.* at 65-66 (Hirni Test.).

On the way to Yankee Stadium, the chauffeured car carrying the four men stopped at a convenience store, where Hirni bought several small bottles of liquor for the group. The men then went on to the game. On their way out of the stadium, Verrusio signaled to Hirni that he and Blackann wanted souvenir jerseys. Hirni paid for them with his corporate credit card. *Id.* at 27, 29 (Blackann Test.); *id.* at 70 (Hirni Test.).

After leaving the stadium, the group went to a strip club called Privilege. Hirni paid the cover charge and the cost of drinks, while Ehrlich paid for several lap dances. Hirni also bought Verrusio and Blackann t-shirts from the club. When the group left, they stopped for pizza before returning to their hotel. The next morning, Hirni paid the hotel expenses, and Verrusio, Blackann, and Hirni took a car to the airport and flew to Washington, D.C. *Id.* at 71-74, 76-77 (Hirni Test.); *see* App. 225 (stipulated facts).

At trial, the parties stipulated to the value of what Verrusio received during the New York trip: The round-trip plane ticket cost $228.50; his hotel and room service costs were $301.27; the face value of the World Series ticket was $110; the World Series jersey cost $130; and Verrusio's pro rata share of the costs for other transportation, dinner, drinks, and the strip club was $490. The total cost of Verrusio's trip, paid by United Rentals, was $1,259.77. *See* App. 225; Verrusio Br. 53-54.

Three days after the trip, Hirni forwarded Verrusio an email from Boulanger that "listed a series of legislative items and

some legislative text that United Rentals was now pushing," and asked whether Verrusio had time to discuss it. Supp. App. 79-80 (Hirni Test.). Verrusio responded that the language "needs a lot more work for anyone to be able to help with progress." App. 262-63 (Hirni Test.).

Because the Senate moved more quickly on the federal highway bill than the House, Blackann began working on United Rentals' agenda before Verrusio did. Blackann notified Verrusio that his office was not going to follow the airmail strategy of waiting until the last moment, but was instead going "to actually work to get something in the Senate version of the bill." Supp. App. 34 (Blackann Test.). Verrusio then gave Blackann a "dressing-down," "saying why don't you just stick with the plan," and warning that "we're going to get killed, you know about all the opposition . . . don't do it." *Id.* Nonetheless, United Rentals' lobbyists succeeded in getting all three of its desired amendments into the bill coming out of the Senate Committee. According to Boulanger, Blackann "was integral" to achieving that result. App. 198. "[H]e basically did a lot of the heavy lifting behind the scenes, in getting objections taken care of from other members of the committee and the staff that worked on that committee." *Id.*

As the bill worked its way through the Senate, Hirni kept Verrusio "in the loop." App. 265 (Hirni Test.). Verrusio in turn helped Hirni understand "the likelihood of the Senate language working in the House" and "when the House was going to act." *Id.* Verrusio also suggested that United Rentals "get elected members on [the House Transportation Committee] to weigh in with the chairman in support of the provisions that we had included in the Senate bill." Supp. App. 8 (Boulanger Test.).

Hirni identified Representative John Boozman as someone whose support United Rentals should cultivate. He emailed one

of Boozman's staff members, Vivian Moeglein, to say that he had "spoken to [Verrusio] and he is good to go." App. 413 (Hirni email to Moeglein). According to Hirni, "good to go" meant that Verrusio was "going to be helpful with [United Rentals'] legislative asks." *Id.* at 271 (Hirni Test.). Hirni also said that he was "resending [Verrusio] the language in the Senate bill, with changes which would represent the 100% victory for [United Rentals]." *Id.* at 413 (Hirni email to Moeglein). Verrusio "asked us," Hirni said, "to give him the language plus what we would want in the perfect world." *Id.*

As the House version of the federal highway bill advanced, Boulanger asked Verrusio for updates. On January 20, 2004, Verrusio emailed Boulanger that he was "[s]till hard at it. Dissenting views still loom with some in leadership. Stay tuned." Supp. App. 13 (Boulanger Test.). Boulanger then emailed Verrusio to ask, "[i]n your gut, what are the odds?," noting that "[t]his seems like a total mess." *Id.* at 13-14. Verrusio responded: "Far from a total mess. No question that there are issues, but we still feel good." *Id.* at 14.

Verrusio's optimism proved misguided. Opposition to United Rentals' amendments remained substantial. Blackann advised Boulanger and Hirni not to continue to pursue them in the House version of the bill because "it would only make [the opposition] more upset." *Id.* Since the language was in the Senate version, Blackann hoped to prevail at the Senate/House conference. He testified that Verrusio was at the "preconference" meeting of Senate and House staff in which Blackann, as Senate designee, presented the United Rentals provisions to the House. *Id.* at 36-37 (Blackann Test.). But the opposition ultimately proved too strong, and United Rentals eventually told its lobbyists that it was no longer interested in pursuing the amendments. They did not make it into the final law. *Id.* at 16 (Boulanger Test.).

9

B

Each year, congressional officials are required to disclose detailed information concerning their financial holdings and transactions, as well as information concerning income, gifts, and reimbursements from private sources.  They must do so on a Financial Disclosure Statement, which asks employees a series of questions.  If they answer "yes" to any of those questions, they must attach additional forms disclosing particular types of information.  The form states that it "will be reviewed by the Committee on Standards of Official Conduct or its designee"; requires the reporting individual to certify that the statements on the form "are true, complete and correct to the best of my knowledge and belief"; and warns that "[a]ny individual who knowingly and willfully falsifies . . . this report may be subject to . . . criminal sanctions."  App. 404 (2003 Verrusio Financial Disclosure Statement) (citing 5 U.S.C. app. 4 § 104; 5 U.S.C. § 1001).

Most relevant here, employees must report gifts from a single source totaling more than $285 on an attachment called "Schedule VI."  A "gift" is defined, with exclusions not relevant here, as "a payment . . . or any thing of value."  App. 423 (Schedule VI Instructions).  "All types of gifts, including travel-related expenses provided for [the employee's] personal benefit, must be reported on Schedule VI."  *Id.*  "[A]ny gift with a fair market value of $114 or less need not be counted."  *Id.*  Thus, for example, if a government employee "received a $90 gift and a $200 item from the same source, neither item would have to be disclosed, since the $90 gift falls below the $114 aggregation threshold and the remaining item is valued at less than $285."  *Id.*  But a "group of items received from the same source at the same time are considered one gift and the total value should be added together."  *Id.*

Employees must also report certain travel payments and reimbursements valued at more than $285 and provided by a private source on a different attachment, called "Schedule VII." Schedule VII is for "travel (including food and lodging) in connection with official duties." *Id.*

When the time came for Verrusio to submit his financial disclosure statement for 2003, he did not include information about the World Series trip on either Schedule VI or VII. Although Verrusio answered "yes" to the question on the main financial disclosure statement asking whether he had "receive[d] any reportable gift in the reporting period," App. 404, he left the attached Schedule VI blank. Verrusio did fill out a Schedule VII, but he did not include the World Series trip on that schedule. *Id.* at 408, 409.

House Ethics Committee[4] staff attorney Paul Lewis reviewed Verrusio's financial disclosure statement for 2003. Lewis noted in an email to Verrusio that, although Verrusio had checked "yes" in the box for gifts to be reported on Schedule VI, "no[] information is reported." Supp. App. 105-06 (Lewis Test.). Verrusio responded that the "Schedule VI 'gifts' section should be checked 'no.'" *Id.* at 108. Although Lewis twice asked Verrusio to so amend his disclosure statement, Verrusio never responded. *Id.* at 109-12.

---

[4]In 2003, the Committee on Standards of Official Conduct was colloquially known as the Ethics Committee. The Committee officially changed its name to the Committee on Ethics at the start of the 112th Congress.

C

In September 2008, FBI Special Agent James Harless contacted Verrusio in connection with the FBI's investigation into Jack Abramoff's lobbying activities. Verrusio initially denied having been on a trip to New York with Jim Hirni. Supp. App. 46 (Harless Test.). He also said he had never been offered tickets to any sporting events by Todd Boulanger, Jim Hirni, or anyone else lobbying on behalf of United Rentals. *Id.*

After the agent confronted him with the fact of the 2003 World Series trip, however, Verrusio admitted that "he was asked to go because Ehrlich and Hirni wanted to get something done on the United Rentals agenda." *Id.* at 47. He also told the agent that "the trip was not an official trip, that it served no official purpose." *Id.* The agent then asked Verrusio why he did not disclose the trip on his financial disclosure form. He initially said that "he had disclosed everything in accordance with Congressional rules," but then Verrusio told the agent that "he knew he should have" disclosed the trip but had not done so. *Id.* at 48-49. He told the agent that, "for him to have included the trip in the disclosure form, . . . he would have had to have misrepresented what the trip actually was, meaning he would have had to have said it was an official trip when, it fact, it wasn't an official trip." *Id.* at 49. Verrusio "said it was not a fact-finding trip," and "that it would not have passed the scrutiny of the Ethics Office." *Id.*

A grand jury indicted Verrusio on March 6, 2009. Count One alleged that Verrusio conspired to receive illegal gratuities in violation of 18 U.S.C. § 371. Specifically, it charged that Verrusio and Blackann "agreed to provide favorable official action to aid [United Rentals] by, among other things, inserting, or causing others to insert, and protecting from removal, the three legislative amendments sought by" United Rentals.

Indictment ¶ 13(b).  Count Two alleged that Verrusio violated the gratuities statute, 18 U.S.C. § 201(c), by accepting items of value "for and because of his official assistance provided and to be provided to [United Rentals'] efforts to secure favorable amendments to the Federal Highway Bill."  *Id.* ¶ 28.  Count Three alleged that Verrusio violated the false statement statute, 18 U.S.C. § 1001, by knowingly and willfully making a materially false statement on his 2003 financial disclosure form.  *Id.* ¶¶ 26-34.

Verrusio moved to dismiss the indictment on all counts for lack of specificity and failure to state an offense.  After the district court denied the motion, Verrusio asked the court to reconsider its ruling with respect to Count Two.  In a hearing on that motion, the district court ordered the government to submit a supplemental brief identifying authorities supporting the proposition that the alleged official acts were cognizable under the gratuities statute.  App. 165.  Instead of submitting a brief, on June 14, 2010 the government filed a superceding indictment, which added information to Counts One and Two.  As to Count One, the government added that "Verrusio advised Blackann that Verrusio and Blackann should wait to insert the amendments sought by [United Rentals] until later in the legislative process, and Blackann understood that Verrusio would insert the amendments at the conference committee stage of the Highway Bill."  Indictment ¶ 15.  As to Count Two, the government added a "to wit" clause, which detailed five forms of "official assistance provided and to be provided to [United Rentals'] efforts to secure favorable amendments to the Federal Highway Bill," including "influencing the language of the Federal Highway Bill."  *Id.* ¶ 28.[5]

_____

[5]The other forms of official assistance specified in the "to wit" clause were:

Verrusio again moved to dismiss Counts One and Two for failure to allege an "official act" within the meaning of 18 U.S.C. § 201(c). The district court denied the motion, and the case proceeded to trial. At the close of the evidence, Verrusio moved for judgment of acquittal. As to Counts One and Two, he argued that the government had failed to prove the "official act" element of the gratuities charges; as to Count Three, he argued that the government had failed to prove the falsity, intent, and materiality elements of the false statements charge. The court denied the motion, and the jury subsequently convicted Verrusio on all counts.

On this appeal, Verrusio contends that: (1) the district court erred in denying his pretrial motion to dismiss Count Two because the indictment failed to allege an "official act"; (2) the

---

        b. advising Blackann that [United Rentals'] amendments should be inserted at the Conference Committee stage;

        c. meeting with Blackann, Ehrlich, and Hirni, and discussing the Federal Highway Bill during the trip to New York City;

        d. advising Hirni that [United Rentals'] amendments needed improvement, and offering to discuss the issue further; and

        e. advising Boulanger and Hirni regarding how to overcome opposition to [United Rentals'] amendments.

Indictment ¶ 28(b)-(e). Because we conclude that the first listed form of assistance -- "influencing the language of the federal highway bill" -- satisfies the "official act" requirement of 18 U.S.C. § 201(c) and was supported by sufficient evidence to warrant conviction, we do not address the other four listed items.

evidence was insufficient to convict on Counts One and Two because it failed to show that he conspired to perform or did perform an official act; (3) the evidence failed to show that he made a false statement on his financial disclosure form; and (4) the district court committed reversible error in excluding a defense exhibit and quashing a defense subpoena. We address Verrusio's first two challenges in Part II and his remaining two challenges in Parts III and IV.

## II

The gratuities statute provides, in relevant part, that any "public official" who:

> otherwise than as provided by law for the proper discharge of official duty . . . directly or indirectly demands, seeks, receives [or] accepts . . . anything of value personally for or because of any official act performed or to be performed by such official . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c). The statute defines "official act" as:

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity.

*Id.* § 201(a)(3). The jury convicted Verrusio of violating the statute (Count Two), and of conspiring with others to violate the statute (Count One).

The Supreme Court has explained the difference between the gratuities offense of § 201(c) and the related bribery offense of § 201(b) as follows:

> The distinguishing feature of each crime is its intent element. Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act, while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act. In other words, for bribery there must be a *quid pro quo* -- a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999).

Not all acts that an official performs come within the scope of the gratuities statute. Verrusio's arguments on appeal focus on two cases that have interpreted the meaning of § 201(c), *United States v. Sun-Diamond Growers* and *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc).

In *Sun-Diamond*, the Supreme Court reversed a trade association's conviction for giving former Agriculture Secretary Michael Espy illegal gratuities (including sports tickets, luggage, and meals) under the parallel subsection of the gratuities section that is applicable to those who give (rather than, as here, to those who receive) gratuities. *See* 18 U.S.C. § 201(c)(1)(A). The trial judge had charged the jury that it could find the association guilty if it "provided Espy with unauthorized compensation simply because he held public

office," and that the "government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all." *Sun-Diamond*, 526 U.S. at 403. The Supreme Court, however, held that the prohibition of "gratuities given or received 'for or because of *any official act* performed or to be performed' . . . means 'for or because of some particular official act,'" and that "the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 406, 414. It is insufficient, the Court said, that the gift is merely "given by reason of the donee's office." *Id.* at 408. It is also insufficient that the gift is given merely "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts." *Id.* at 405.

In *Valdes*, this court reversed a police detective's conviction for accepting cash for searching police databases for information requested by an undercover informant. Focusing on the statutory definition of official act, the court held that the detective's actions were not on a "question [or] matter" that could be described as "'pending' or capable of being 'by law . . . brought'" before him. 475 F.3d at 1324 (quoting 18 U.S.C. § 201(a)(3)). That definition, the court said, "refers to a class of questions or matters whose answer or disposition is determined by the government," which would "include[] such questions as 'Should the Congress enact new legislation regulating corporate directors?'" *Id.* "Except in limited circumstances," we said, a mere "release of information" does not come within that class. *Id.* at 1329.

In the following subparts, we apply this background to Verrusio's challenges to the validity of the indictment and the sufficiency of the evidence.

17

A

Verrusio contends that the district court should have dismissed Count Two because it omitted an essential element of the gratuities offense: the allegation of an "official act." Verrusio Br. 37; Reply Br. 4. Because it presents a question of law, we review this contention de novo. *See United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005).[6]

It is certainly true that an indictment must "'contain[] the elements of the offense intended to be charged.'" *United States v. Pickett*, 353 F.3d 62, 66 (D.C. Cir. 2004) (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)). But the validity of an indictment "is not a question of whether it could have been more definite and certain." *United States v. Debrow*, 346 U.S. 374, 378 (1953). Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense. *See Russell*, 369 U.S. at 763-64; *United States v. Blackley*, 167 F.3d 543, 550 (D.C. Cir. 1999).[7]

Verrusio's indictment did in fact inform him of the precise offense of which he was accused, including the "official act" element. Count Two charged him with "demand[ing], seek[ing], receiv[ing], [and] accept[ing] . . . a thing of value personally *for*

[6]Although Verrusio's briefs suggested that he also challenged the sufficiency of the indictment's allegations with respect to Count One, he indicated at oral argument that he did not intend to do so. *See* Oral Arg. Recording at 17:35 (Nov. 12, 2013).

[7]Because Verrusio does not claim that the indictment was insufficient to protect him from double jeopardy, we consider only whether it adequately informed him of the offense alleged.

*and because of an official act* performed and to be performed by defendant Verrusio," in violation of 18 U.S.C. § 201(c)(1)(B). Indictment ¶ 28 (emphasis added).

Nor was that all the indictment said. Count Two charged that Verrusio,

> being a public official and otherwise than as provided by law for the proper discharge of official duty, did directly and indirectly demand, seek, receive, [and] accept . . . a thing of value personally for and because of an official act performed and to be performed by [him], that is, defendant VERRUSIO did accept a trip to Game One of the 2003 Baseball World Series in New York City for and because of his official assistance provided and to be provided to [United Rentals'] efforts *to secure favorable amendments to the Federal Highway Bill, to wit: a. influencing the language of the Federal Highway Bill . . . .*

Indictment ¶ 28 (emphasis added). Indeed, the General Allegations section of the indictment specified the particular amendments that United Rentals sought:

> In particular, Boulanger and Hirni sought three amendments to the Federal Highway Bill. One amendment would have encouraged public works agencies to rent rather than purchase construction equipment . . . . Another amendment would have encouraged public works agencies to contract only with those companies -- such as [United Rentals] -- which had large dollar amounts of liability insurance coverage . . . . A third amendment would have encouraged public works agencies to use work zone

safety systems such as those provided by [United Rentals].

*Id.* ¶ 6; *see id.* ¶ 26 (incorporating General Allegations into Count Two). Accordingly, not only did Verrusio's indictment allege an official act, it specified the particular act that *Sun-Diamond* requires.

Verrusio makes two further claims in connection with his challenge to the indictment. First, he maintains that the only argument in the government's appellate brief on this point was that Count Two sufficiently alleged an "official act" merely by alleging that Verrusio would provide "official assistance"; that in so doing the government waived any other argument it might have had in support of the indictment; and that as a consequence the indictment must fall because "official assistance" is insufficiently "specific" under *Sun-Diamond*. Reply Br. 8-9, 10-12. Verrusio's syllogism fails because its premise is incorrect. The government did not rest its support of the indictment merely on "official assistance," but on a particular kind of assistance. The government argued that "the charging language in Count 2 . . . describes the official act as 'official assistance provided and to be provided to [United Rentals'] efforts to secure favorable amendments to the Federal Highway Bill,'" and pointed out that "Verrusio's contention that Acts 1 and 3 lack specificity is beside the point when the specific 'official act' is assisting United Rentals win passage of the amendments." Gov't Br. 28 (quoting Indictment ¶ 28).

Second, Verrusio contends that Count Two of the indictment failed to allege an official act because it failed to say "*how* Mr. Verrusio was going to use his position" to help United Rentals. Reply Br. 10. This is necessary, he says, because *Valdes* requires that an official act "involved using his official position to influence the decision-making process." *Id.* at 9

(citing *Valdes*, 475 F.3d at 1324). But whether or not such specificity is required in an indictment, Verrusio's indictment supplied it. As we have noted, one of the official acts specified in Count Two was assisting in United Rentals' "efforts to secure favorable amendments to the Federal Highway Bill," by, among other things, "influencing the language of the Federal Highway Bill." Indictment ¶ 28. That is certainly a "question[] or matter[] whose answer or disposition is determined by the government." *Valdes*, 475 F.3d at 1324. Indeed, it is indistinguishable from the "question or matter" that *Valdes* gave as an example of one that plainly comes within the statute: "'Should the Congress enact new legislation regulating corporate directors?'" *Id.* Moreover, as the evidence at trial showed, the question of whether the amendments should be added to the bill was "pending" before and to be answered (at least partly) by the committee for which Verrusio was the policy director. *See infra* Part II.B.4.

Nothing more (and perhaps less) is sufficient to satisfy *Valdes*. The indictment certainly need not allege precisely *how* Verrusio contemplated influencing that language. Would he do it by himself or ask someone else to do it? Would that someone else be Colonel Mustard or Professor Plum? With a candlestick or a rope, in the library or the study? Answering those questions is not required at the indictment stage. Alleging that Verrusio received gratuities for his official assistance in "securing favorable amendments" to the federal highway bill by "influencing [its] language" is sufficiently specific.

In sum, because the indictment alleged that Verrusio accepted the World Series trip for or because of his official assistance in influencing the language of the federal highway bill, the charge contained the required element, and the district court correctly denied Verrusio's motion to dismiss.

21

B

Verrusio also argues that the evidence admitted at trial was insufficient to convict him on Counts One and Two. Evidence is sufficient to sustain a verdict if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making that determination, we draw "no distinction between direct and circumstantial evidence, and giv[e] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008) (internal quotation marks omitted). Verrusio contends that the evidence was insufficient in the following respects.[8]

1. Verrusio's principal contention is that the evidence failed to "connect the item of value received by the public official to a specific official act." Verrusio Br. 15. No violation of the gratuities statute occurs, he notes, if "the item of value was provided because of a public official's position or for future, unspecified acts." *Id.*

This argument attempts to fit the square peg of this case into *Sun-Diamond's* round hole. As we noted above, the indictment did not allege that the World Series trip was given merely on account of Verrusio's official position or for some unspecified future action that he might take. *See supra* Part II.A. Rather, it charged that Verrusio received the World Series trip "for" his official assistance in "secur[ing] favorable amendments to the Federal Highway Bill . . . to wit . . . influencing the language of

_____

[8]Because Verrusio does not present any sufficiency arguments that he contends are unique as to either count, we do not address the counts separately.

the Federal Highway Bill . . . ." Indictment ¶ 28. And as we explained above, that allegation is sufficient under *Sun-Diamond* to satisfy the "official act" element of the gratuities offense -- if the government establishes it at trial. *See supra* Part II.A. In our view, the government did so.

As set out in Part I, the evidence showed that United Rentals wanted specific amendments inserted into the then-pending federal highway bill. Lobbyists Boulanger and Hirni discussed United Rentals' desired amendments with Senate staffer Trevor Blackann, who in turn discussed those amendments with Verrusio. Because of their respective positions in the Senate and House Committees responsible for the bill, both Blackann and Verrusio were well situated to help United Rentals advance its legislative agenda.

Blackann testified that he discussed United Rentals' legislative agenda with Verrusio because he knew, from his discussions with Boulanger and Hirni, "that they were also working with Mr. Verrusio on the same package of amendments." App. 220. Blackann said that he and Verrusio anticipated opposition to United Rentals' desired amendments, and that they "discussed the idea of waiting till the last possible minute legislatively to insert the provisions," which Blackann termed the "airmail strategy." *Id.* at 221. Verrusio was adamant that this was the route that United Rentals should take, and Blackann so advised United Rentals' lobbyists. *Id.*

It was after these discussions that United Rentals employee Ehrlich asked the lobbyists whether "there were any government officials that [United Rentals] would be interested in taking [to the World Series] that could be helpful" in advancing the company's legislative agenda. App. 188 (Boulanger Test.). Together they decided to invite Blackann and Verrusio because "they were in positions to be helpful . . . [s]pecifically" with

"[t]he United Rentals' amendments that we were seeking to include in the highway bill." Supp. App. 19-20 (Boulanger Test.). Boulanger knew that Verrusio was "close" to the chairman of the House Committee and hoped to "influence him . . . to do some things for our clients." *Id.* at 21-22. Similarly, Hirni acknowledged that he had used the "tickets in [an] attempt to influence the Congressional staff for legislation." *Id.* at 85.

The emphasis on specific legislation continued while the two lobbyists and the two congressional staffers were in New York. Over drinks and dinner, the four men "talked a lot about United Rentals" and "got into a conversation about concepts and ideas United Rentals had for federal legislation." *Id*. at 64 (Hirni Test.). Verrusio "walked them through" the airmail strategy, indicating that it had "the best chance for ultimate success." *Id.* at 27 (Blackann Test.).

Although the relevant legal issue at trial was what the all-expenses-paid trip was "for" at the time it was given, the jury was also free to look to post-trip events as circumstantial confirmation of the parties' original intentions. *See United States v. Mitchell*, 49 F.3d 769, 776 (D.C. Cir. 1995) (noting that "subsequent acts may sometimes be relevant to the intent underlying an earlier act"); *United States v. Gallo*, 543 F.2d 361, 365 (D.C. Cir. 1976) (same). That evidence likewise indicated that the World Series trip was given for Verrusio's assistance in inserting language into the highway bill. Just three days after the trip, Hirni forwarded Verrusio an email from Boulanger that "listed a series of legislative items and some legislative text that United Rentals was now pushing." Supp. App. 79 (Hirni Test.). Soon thereafter, Blackann told Verrusio that his office was going "to actually work to get something in the Senate version of the bill." *Id.* at 34 (Blackann Test.). According to one of the lobbyists, Blackann "was integral" to United Rentals' success in

getting all three of its amendments included in the bill coming out of the relevant Senate committee. App. 198 (Boulanger Test.). And while the company was unsuccessful on the House side, there was nonetheless substantial evidence that Verrusio also kept trying to help with the language until the very end. *See* App. 413 (Hirni email to Moeglein) (stating that Verrusio had asked him for the language of United Rentals' amendments "plus what [it] would want in the perfect world"); *id.* (stating that Hirni had sent Verrusio "the language in the Senate bill, with changes which would represent the 100% victory for" United Rentals).[9]

In sum, after hearing all of the evidence, a reasonable juror could readily have concluded that the World Series trip was given and received "for or because of some *particular* official act" -- that is, for influencing the language of the federal highway bill -- and not merely "by reason of [Verrusio's] office" or merely "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts," *Sun-Diamond*, 526 U.S. at 405-07 (emphasis added).

2. Verrusio further maintains that the government failed to establish the intent element of the gratuities offense because there was insufficient evidence that "the alleged official acts . . . [were] contemplated when [he] accepted the illegal gratuity." Verrusio Br. 15. We conclude, to the contrary, that the evidence was sufficient for the jury to find that Verrusio

---

[9]*See also* Supp. App. 13 (Verrusio email to Boulanger) ("Still hard at it. Dissenting views still loom with some in leadership. Stay tuned."); *id.* at 14 (Verrusio email to Boulanger) ("Far from a total mess. No question there are issues, but we still feel good."); *id.* at 36-37 (Blackann Test.) (noting that Verrusio was at the "preconference" staff meeting at which Blackann, as Senate designee, presented United Rentals' amendments to the House).

accepted the gift knowing it was being given for the particular act of influencing the language of the federal highway bill. Indeed, the evidence was also sufficient to find that Verrusio intended to do so.[10]

As the evidence set forth above shows, when the opportunity to give the World Series tickets arose, United Rentals did so for and because of Verrusio's anticipated help in inserting its desired amendments into the bill. The testimony of Ehrlich, Hirni, and Boulanger was more than sufficient to

---

[10]It is doubtful that proof of the latter, heightened level of intent is required.  *See Sun-Diamond*, 526 U.S. at 404-05 ("The distinguishing feature of each crime[, bribery and gratuity,] is its intent element. . . .  An illegal gratuity . . . may constitute merely a reward for some future act that the public official will take (and *may* already have determined to take), or for a past act that he has already taken." (emphasis added)); *United States v. Brewster*, 408 U.S. 501, 527 (1972) ("To sustain a [gratuities] conviction it is necessary to show that appellee solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act."); *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996) ("A central difference between accepting a bribe and accepting a gratuity is the degree of culpable intent on the part of the recipient; . . . to convict for accepting a gratuity the jury need only find that the defendant acted 'knowingly and willingly.'" (quoting *United States v. Campbell*, 684 F.2d 141, 150 (D.C. Cir. 1982))); *Campbell*, 684 F.2d at 150 (indicating that the intent element of the gratuities offense is satisfied by showing that the defendant "accepted gifts 'with knowledge that the donor was paying him compensation for an official act.'" (quoting *Brewster*, 408 U.S. at 527)); *United States v. Brewster*, 506 F.2d 62, 77 (D.C. Cir. 1974) (holding that "[w]hat is outlawed" by the gratuities offense "is only the knowing and purposeful receipt by a public official of a payment, made in consideration of an official act, for himself").

establish that point.[11] Did Verrusio know that was why he was being offered the tickets? In taking them, did he intend to help the company in the way it hoped he would? Verrusio was the policy director for the House Committee with jurisdiction over the federal highway bill. Before he went on the trip, he had already discussed, in detail, the amendments United Rentals wanted with both the company's lobbyists and with Blackann, his counterpart in the Senate. *See* App. 220 (Blackann Test.). Together the two had already devised a strategy for how they might achieve United Rentals' goals. Surely a reasonable jury could have concluded that, before getting on the airplane to New York City, Verrusio knew what the company wanted, knew why it had turned to him, and indicated that he planned to help. Once in New York, Verrusio's active participation in the discussion of United Rentals' "concepts and ideas . . . for federal legislation," Supp. App. 64 (Hirni Test.), provided further evidence that he knew he was receiving an illegal gratuity. The chauffeured car ride, the World Series game, the souvenir jerseys, and the strip club all came afterwards.

Once again, post-trip events could have provided a reasonable jury with further confirmation of the parties' original intentions. *See supra* Part II.B.1; *see, e.g.*, *Mitchell*, 49 F.3d at

---

[11]*See, e.g.*, App. 188 (Boulanger testimony that Ehrlich asked the lobbyists if "there were any government officials that [United Rentals] would be interested in taking [to the World Series] that could be helpful" in advancing the company's legislative agenda); Supp. App. 19-20 (Boulanger testimony that Ehrlich and Boulanger, in conjunction with Hirni, decided to invite Blackann and Verrusio because "they were in positions to be helpful . . . [s]pecifically" with "[t]he United Rentals' amendments that we were seeking to include in the highway bill"); *id.* at 85 (Hirni testimony that he used the World Series "tickets in [an] attempt to influence the Congressional staff for legislation").

776.  That evidence ranged from Hirni forwarding Verrusio -- just three days after the trip -- an email that "listed a series of legislative items and some legislative text that United Rentals was now pushing," Supp. App. 79 (Hirni Test.); to Verrusio indicating to Hirni that he was "going to be helpful with our legislative asks," App. 271 (Hirni Test.); to Verrusio asking Hirni, three months after the trip, to "give him the language plus what [United Rentals] would want in the perfect world," *id.* at 413 (Hirni email to Moeglein).  That evidence also included Verrusio's failure to list the trip on his financial disclosure form, Supp. App. 105-106 (Lewis Test.), and his initial failure to disclose the nature of the trip to an FBI agent, *id.* at 46 (Harless Test.).  The jury could have inferred consciousness of guilt from both of those false statements.  *See United States v. Shabban*, 612 F.3d 693, 697 (D.C. Cir. 2010) (finding that the defendant "evidenced consciousness of guilt" by making false statements about an event).  And, of course, the jury heard Verrusio's admission to FBI Agent Harless that he was "asked to go" to the World Series "because Ehrlich and Hirni wanted to get something done on the United Rentals agenda."  Supp. App. 47 (Harless Test.)

3. Verrusio's third argument is that "the government proved, at most, that Mr. Verrusio shared publicly available information with lobbyists," and that the "sharing of information is not an official act because it does not implicate a public official using his position to influence decision-making." Verrusio Br. 15.

It is true, as we noted above, that this court has held that, "[e]xcept in limited circumstances," the mere "release of information" does not come within the statutory definition of "official act."  *Valdes*, 475 F.3d at 1329.  But it does not matter if, "during the [World Series] trip," Verrusio's only acts were to "provide[] generic advice and publicly-available information

regarding how United Rentals could achieve its goals." Reply Br. 14. The gratuities statute proscribes payments "for or because of any official act performed *or to be performed* by such official." 18 U.S.C. § 201(c)(1)(B) (emphasis added). Nor does it matter whether Verrusio succeeded in influencing the language -- or even tried to do so. As we explained in *Valdes*, "the anti-gratuity provision has no requirement that the payment actually influence the performance of an official act." 475 F.3d at 1322 (internal quotation marks omitted). What matters is what the gift was *contemplated for* at the time it was given. And for the reasons set forth above, a reasonable jury could readily have concluded the World Series trip was contemplated for the particular act of getting United Rentals' language into the federal highway bill.

4. Finally, Verrusio suggests that he could not have received a payment for "influencing the language of the Federal Highway Bill" because he was not responsible for drafting legislation or deciding whether it would get into the bill. This is the same argument we rejected in *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013), another case involving Jack Abramoff's lobbying team. Ring was charged with paying an illegal gratuity when he gave Washington Wizards basketball tickets to a Justice Department attorney as a reward for helping to expedite review of a visa application. Ring's defense was that the attorney lacked decisionmaking authority with respect to visa applications, and that all the attorney did (or could do) was to call a secretary at the Immigration and Naturalization Service (INS), who in turned passed on the request to various INS officials, who ultimately agreed to expedite the application. *Id.* at 469. In rejecting Ring's defense, we held:

> [T]he attorney acted in his official capacity to *influence* the visa application process . . . . To be sure, the attorney himself lacked independent authority to

expedite visa applications. But Ring's attempt to import a requirement that the official in question have ultimate decisionmaking authority into the definition of "official act" has no statutory basis.

*Id.* at 470 (citations omitted).

As policy director of the House Committee with jurisdiction over the federal highway bill, Verrusio was well-positioned to influence its language. *See* App. 188-91 (Boulanger Test.); Supp. App. 22 (Blackann Test.); *id.* at 46 (Harless Test.). Blackann testified that "Mr. Verrusio, he's the policy director for the whole committee, so he's kind of got the umbrella authority overall of the subcommittees. . . . [Verrusio] is the guy, based on his position, that could come in at the last minute with Chairman Young's last-minute priorities. . . . He had the ability to come in at the last minute and do something different." Supp. App. 43. Indeed, Blackann testified that Verrusio was there at the "last minute" -- at the "preconference" staff meeting at which Blackann presented the United Rentals provisions of the Senate bill to the House. *Id.* at 37. All of this was sufficient evidence of Verrusio's ability to influence the content of the highway bill, even if he did not have ultimate authority to determine its final language. *Cf. United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision." (citations omitted)).

Accordingly, we conclude that there was sufficient evidence to sustain Verrusio's convictions on Counts One and Two.

III

Verrusio also contends that the evidence was insufficient to sustain his conviction on Count Three for making a false statement on his 2003 financial disclosure statement. He makes two arguments in support of that proposition.

A

At trial, Verrusio's principal argument was that, although the indictment charged that he made a false statement on Schedule VI (gifts) of his financial disclosure form, the evidence introduced at trial only showed that he should have reported some of the World Series items on Schedule VII (official travel). The two premises of this argument were that the travel-related expenses (transportation, meals, lodging) were reportable on Schedule VII, and that the value of the remaining items (the strip club, World Series tickets, jerseys) did not meet the reporting threshold for Schedule VI. *See* Trial Tr. 112-16 (Feb. 7, 2011 p.m.). As a consequence, Verrusio contended, there was nothing false about his failure to fill out Schedule VI. He repeats that argument on appeal.

The government responds by challenging the first premise, maintaining that all of the items should have been reported on Schedule VI, not VII.[12] To this, Verrusio replies that there was no evidence upon which the jury could "differentiate between reportable 'gifts' and 'travel'" because "no witness -- expert or otherwise -- testified with specific knowledge about what gifts are reportable on Schedule VI." Reply Br. 14-15. Verrusio is wrong. The jury was presented with sufficient evidence

---

[12]Because the government does not challenge the second premise on appeal, and because it is not necessary to our disposition, we do not address it.

regarding which information had to be reported on Schedule VI and which on Schedule VII, as well as with sufficient evidence to support the charge that he should have reported all of the items from the World Series trip on Schedule VI.

First, the court admitted the instructions for Schedule VI as an exhibit. Those instructions explain the difference between the two schedules. The instructions state that employees must report gifts from a single source totaling more than $285 on Schedule VI. "All types of gifts, *including travel-related expenses provided for [the employee's] personal benefit*, must be reported on Schedule VI." App. 423 (emphasis added). By contrast, the instructions explain, Schedule VII is for privately funded "travel (including food and lodging) *in connection with official duties*." *Id.* (emphasis added).

Second, there was sufficient evidence for the jury to conclude that the trip and its related expenses were for Verrusio's "personal benefit," and not "in connection with official duties." In particular, the jury heard Verrusio's statements to the FBI: Verrusio admitted "that he knew he should have" disclosed the trip, and further admitted that it "wasn't an official trip." Supp. App. 49 (Harless Test.). Blackann likewise testified that the trip was not for official business. *Id.* at 44. So, too, did Hirni and Ehrlich. *See* App. 251 (Hirni Test.); *id.* at 287 (same); Supp. App. 88 (Ehrlich Test.). And, of course, Verrusio did not report the trip on Schedule VII either.

B

Verrusio also maintains that a reasonable juror could not have found that the failure to disclose the trip and related expenses was "material" because "[t]here was no testimony as to how, if at all, the information disclosed in the [financial

disclosure] statements could have influenced the action of the Ethics Committee." Verrusio Br. 51. An essential element of the false statement offense of 18 U.S.C. § 1001(a)(2) is that the statement be "materially false." *United States v. Moore*, 612 F.3d 698, 700 (D.C. Cir. 2010). A statement "need not actually influence an agency in order to be material; it need only have 'a natural tendency to influence, or [be] capable of influencing' an agency function or decision." *Id.* at 701-02 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). Nor must the government "present any testimony or other evidence specifically for the purpose of establishing the materiality of [the defendant's] false statement." *Id*. at 702. Rather, the jury can infer from other evidence that the false statement "was capable of affecting" the agency's functions. *Id.*

In this case, the jury could reasonably have inferred that Verrusio's false statement on his 2003 financial disclosure form was material. The form specifically stated that it "will be reviewed by the Committee on Standards of Official Conduct or its designee." App. 404. Committee attorney Paul Lewis further testified that the Committee told its staff to determine whether financial disclosure statements were "accurate," "complete," and "complied with applicable laws and rules." Supp. App. 95 (Lewis Test.). From this, the jury could reasonably conclude that, by omitting items required to be listed on the form and falsely certifying that it was nonetheless "true, complete and correct," App. 404, Verrusio interfered with the Ethics Committee's ability to perform its function of monitoring compliance with relevant rules. Verrusio's omissions plainly affected the functions of staff attorney Lewis, who had to follow up with Verrusio repeatedly regarding the inconsistencies in his disclosure forms. *See* Supp. App. 105-12 (Lewis Test.). And Verrusio himself admitted to the FBI that, had he listed the trip on the form, it "would not have passed the scrutiny of the Ethics Office." *Id.* at 49 (Harless Test.). *Cf. United States v. Stadd*,

636 F.3d 630, 639 (D.C. Cir. 2011) (finding that the defendant's misrepresentation about a conflict of interest in an email to agency counsel was material because, if the defendant "had accurately reported the substance" of his conflict, he "would have raised red flags that would have led [the agency lawyer] to inquire further"); *Moore*, 612 F.3d at 702 (holding that the jury could reasonably have inferred that the defendant's signing of a false name on a postal service delivery form "was capable of affecting the Postal Service's general function of tracking packages and identifying the recipients of packages entrusted to it").

IV

In this Part, we address Verrusio's contentions that the district court committed reversible error by excluding a defense exhibit and quashing a defense subpoena.

A

Verrusio contends that the district court committed reversible error when it excluded the instructions for Schedule VII of the financial disclosure statement. As noted in Part III.A, the theory of Verrusio's defense was that several of the expenses relating to the World Series trip were not personal gifts, which must be disclosed on Schedule VI, but rather were travel expenses related to his official duties, which instead belonged on Schedule VII. On that theory, Schedule VI did not contain any false statements. Accordingly, Verrusio sought to introduce the instructions for Schedule VII into evidence.

Although the district court admitted Verrusio's entire financial disclosure statement, including Schedule VII, and also admitted the instructions for Schedule VI, it excluded the Schedule VII instructions on relevance grounds. *See* App. 316-

17. In that respect, the court erred, because the instructions -- which discussed the difference between Schedules VI and VII -- were relevant to Verrusio's defense. Nonetheless, that error helps Verrusio only if it was not harmless. *See* FED. R. CRIM. P. 52(a). And because the alleged error "did not involve a constitutional right," it is harmless "as long as 'it did not have a substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Stubblefield*, 643 F.3d 291, 296-97 (D.C. Cir. 2011) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see United States v. Powell*, 334 F.3d 42, 45 (D.C. Cir. 2003). We conclude that the error was harmless.

As we have noted, the Schedule VI instructions, which were admitted into evidence, read: "All types of gifts, including travel-related expenses provided for your personal benefit, must be reported on Schedule VI. However, travel (including food and lodging) in connection with official duties is reported separately on Schedule VII." App. 423. Given that instruction, Verrusio was able to (and did) present to the jury his theory that the expenses he failed to report on Schedule VI involved travel in connection with his official duties and hence were not reportable on Schedule VI. *See* Trial Tr. 84 (Feb. 7, 2011 p.m.). There was, however, more than enough evidence for the jury to reject this theory. *See supra* Part III.A.

The remaining question is whether there was anything in the Schedule VII instructions that was not in the Schedule VI instructions and that harmed Verrusio's defense by its absence. The non-admitted Schedule VII instructions state, in pertinent part:

> [Y]ou must disclose in this section travel for such activities as speaking engagements, conferences, or fact-finding events related to official duties. You must

> also disclose privately paid travel that, while *not* related to your official duties, was not provided merely for your personal benefit; for example, travel paid for by corporations that you or your family own, travel that is necessary in connection with your service as an officer or board member of any organization, and travel for job interviews must be disclosed here. . . . In contrast, travel-related expenses provided merely for your personal benefit (for example, a vacation paid for by a personal friend) are subject to the reporting requirements for Schedule VI.

App. 424. Of the specific items that the instruction lists as reportable on Schedule VII, the only one that Verrusio might have argued applied to the New York trip was that it was a "fact-finding event[] related to official duties." But nothing precluded Verrusio from making that claim to the jury using the admitted instruction, which stated that "travel (including food and lodging) in connection with official duties is reported separately on Schedule VII."

The additional advantage of having an instruction stating specifically that a "fact-finding event[] related to official duties" was reportable on Schedule VII, when there was an admitted instruction saying that "travel . . . in connection with official duties" was reportable on that Schedule, was minimal. That is particularly so considering that no witness testified the trip was "related to official duties" at all. Three witnesses specifically said it was not. *See* App. 222-23 (Blackann Test.); Supp. App. 44 (same); App. 251 (Hirni Test.); *id.* at 287 (same); Supp. App. 88 (Ehrlich Test.). Moreover, Verrusio himself told the FBI that "it was not a fact-finding trip." Supp. App. 49 (Harless Test.). And, of course, he did not report the trip on Schedule VII (or VI).

Verrusio also contends that he was prejudiced because the non-admitted Schedule VII instructions state that pre-approval of a trip by the Ethics Committee is not required. But the government did not argue that pre-approval of the World Series trip was required, and testimony and defense argument underscored that point. *See* App. 222 (Blackann Test.); Supp. App. 151-52 (defense closing argument). Accordingly, neither this nor any of the preceding arguments persuades us that the exclusion of the Schedule VII instructions had "a substantial and injurious effect or influence in determining the jury's verdict," *Stubblefield*, 643 F.3d at 296-97 (internal quotation marks omitted).

B

Verrusio subpoenaed Vivian Moeglein, the former legislative director for Congressman John Boozman, seeking her testimony that Verrusio did not press her to act in United Rentals' favor. Moeglein moved to quash on the ground that her testimony was privileged under the Speech or Debate Clause, *see* U.S. CONST., art. I, § 6, and the district court agreed. Verrusio now contends that the protection of the Speech or Debate Clause is not absolute, and that the court should have balanced his Fifth and Sixth Amendment rights against the Speech or Debate Clause privilege and found that his rights prevailed. Alternatively, Verrusio contends that the district court should have granted his motion to dismiss the indictment because the unavailability of the witness deprived him of his ability to present a defense.

As Verrusio conceded at oral argument, he has waived the first contention. Oral Arg. Recording at 38:58-41:01. At trial, Verrusio's counsel told the court that "the defense fully recognizes the high hurdle that the Speech or Debate clause imposes here, and we really don't have many quibbles with

House counsel's brief," which argued that the Speech or Debate privilege was absolute. App. 336.

Because Verrusio waived this argument, any error was extinguished. *See United States v. Olano*, 507 U.S. 725, 733 (1993). But even if we were to regard the argument as merely forfeited rather than waived, it would still fail under the plain error standard of review. *See Johnson v. United States*, 520 U.S. 461, 467 (1997). Verrusio points to *no* case in which *any* court has found that a defendant's Fifth and Sixth Amendment rights trump the Speech or Debate Clause privilege, and he acknowledges that this is "an issue that has apparently never been directly confronted by any court." Verrusio Br. 39. In such circumstances, an error cannot be plain. *See United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) ("Absent controlling precedent on the issue or some other absolutely clear legal norm, the district court committed no plain error." (internal quotation marks and citation omitted)). Accordingly, we affirm the district court's decision to quash the subpoena for Moeglein's testimony without deciding whether it was erroneous.

Although Verrusio did not waive his second contention, it also fails. Repeating an argument that he raised before the case went to the jury, App. 365, 369, Verrusio contends that the district court should have dismissed the indictment because quashing Moeglein's subpoena deprived him of material evidence, thereby violating his rights to compulsory process and due process. To establish a compulsory process violation, a defendant must show "more than the mere absence of testimony." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Rather, he must make "some showing that the evidence lost would be both material and favorable to the defense." *Id.* at 873. A "witness' testimony is material [only] if its absence actually prejudiced the defendant's ability to

mount a defense." *United States v. Dean*, 55 F.3d 640, 662 (D.C. Cir. 1995); *see id.* at 663 n.14; *Valenzuela-Bernal*, 458 U.S. at 867-69. And "at least the same materiality requirement obtains with respect to a due process claim." *Valenzuela-Bernal*, 458 U.S. at 872.

Verrusio has not shown that Moeglein's testimony was material in the above sense. He contends that he could have "elicit[ed] testimony from [her] about her interactions with Hirni, including his offer to buy her lunch and his offer of tickets to a sporting event." Reply Br. 24 (citing trial proffer). But the fact that the lobbyist offered other staffers gifts hardly exculpates Verrusio, whether or not those gifts constituted illegal gratuities. Verrusio also proffers that Moeglein would have said "that Mr. Verrusio was not in fact inserting himself in the process, that he was not placing the pressure on her, that she independently was communicating with Mr. Hirni, and that she has no recollection of any pressure being put on her by Mr. Verrusio." *Id.* (quoting App. 342). But as we explained above, *see supra* Part II.B.3, the government was not required to show that Verrusio took any affirmative steps to add United Rentals' amendments to the federal highway bill, let alone that he pressured Moeglein to act in United Rentals' favor. Moreover, even if the proffer were accurate, the fact that Verrusio did not pressure one staffer is no (or, at best, extraordinarily weak) evidence that he did not try to influence others.

Finally, we note that, after the court quashed the subpoena, it went on to consider whether to strike two previously admitted email chains between Moeglein and Hirni. The issue was resolved when the parties instead agreed to redact Moeglein's statements from the email chains, strike testimony discussing those statements, and preclude argument about her conduct. App. 361-62, 366-68. Verrusio still argued that he needed Moeglein as a witness to explain the statements that Hirni made

to her in emails. But the redactions greatly, if not entirely, mitigated the value of her testimony, given that the "speaker" in the emails -- Hirni -- testified at trial and was subject to cross-examination. Verrusio has not suggested what kind of admissible testimony Moeglein could have offered to explain Hirni's statements. And he has proffered nothing to suggest that his inability to put Moeglein on the stand "actually prejudiced [his] ability to mount a defense." *Dean*, 55 F.3d at 662. Accordingly, we find no error in the district court's denial of Verrusio's motion to dismiss the indictment.

V

For the foregoing reasons, we conclude that Verrusio's indictment did not omit an essential element of the charges against him, that the evidence at trial was sufficient to sustain his convictions, and that Verrusio was not prejudiced by the district court's decisions to exclude a defense exhibit and quash a defense subpoena. The judgment of the district court is therefore

*Affirmed*.